IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,962

STATE OF KANSAS,
*Appellee*,

v.

DERRICK RICHARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

A trial court's determination of whether to admit evidence of a defendant's prior crime or civil wrong is governed by a three-part test:

First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.

Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.

Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion.

2.

A person challenging the legality of a search must establish that he or she was the victim of an invasion of privacy. To establish a sufficient interest to have standing to challenge the legality of a search, the challenger must claim either to have a proprietary or possessory interest in the premises searched or to have owned or possessed the seized property.

3.

For a consent to search to be valid there must be clear and positive testimony that the consent was unequivocal, specific, and freely given, without duress or coercion, either expressed or implied. An individual's mental state is a factor in determining the voluntariness of his or her consent to search.

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed September 5, 2014. Affirmed.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause, and *Ryan Eddinger* and *Deborah Hughes*, of the same office, were on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A jury convicted Derrick Richard of felony murder based upon the underlying felony of criminal discharge of a firearm at an occupied building. Richard allegedly fired his handgun at a neighbor's house, and a bullet fatally wounded a man sitting inside the house. On direct appeal, Richard raises three evidentiary issues. We

have jurisdiction under K.S.A. 22-3601(b)(1) (direct appeal for conviction of off-grid crime; life sentence). Finding no error, we affirm.

FACTS AND PROCEDURAL OVERVIEW

During the evening of July 16, 2010, Grady Lane and his wife, Erin Gonzalez-Lane, were watching television in the second-story family room of their home at 532 North Wabash in Wichita, Kansas. Gonzalez-Lane went downstairs to bed around 10 p.m., while Lane stayed in the family room to play video games. At around 11 p.m., Gonzalez-Lane heard what she described as "[p]ow, pow, pow, pow." Gonzalez-Lane assumed the noise was fireworks; therefore, after checking on her children, she decided all was well and went to sleep.

That same evening, at approximately 11 p.m., Officer Jason Waite responded to a call reporting gunshots fired in the nearby area of 500 North Ohio. Officer Waite encountered Derrick Richard in the street between two houses at 529 and 532 Wabash, but Richard said he had not heard gunshots or fireworks.

The next morning, Gonzalez-Lane discovered Lane still in the upstairs family room, but he was not breathing and there was "a lot of blood." Officers Chad Richardson and Channara Seang responded to Gonzalez-Lane's 911 call. They observed Lane, dead from a gunshot wound to the head, slumped over on his side as if he had been sitting upright on the couch and had fallen over. The officers discovered a single bullet hole in the family room window glass and three bullet holes in an interior wall, all of which appeared to have come from outside. Crime Scene Investigator Natalie Rowe collected three bullet fragments from inside the room.

3

The family room window faced the Lane's backyard, and an officer noted that if Lane had been sitting up on the couch, he would have been visible through the window for a shooter located in the backyard. A search of Lane's backyard yielded four spent cartridge casings (fired rounds) and one unfired cartridge, all designed to be used in a .45 caliber handgun and all manufactured by Speer. The cartridges were found approximately 20 to 25 yards from the family room window.

Gonzalez-Lane told police she "had a notion" that Richard, their neighbor directly to the south at 524 North Wabash, killed Lane because the two men had been in a dispute over a dog. Gonzalez-Lane also told police that Richard had previously fired shots in the neighborhood, after which he called Lane to tell him Richard was "just blowing off some steam and . . . everything was okay."

Richard lived with his daughter, Jasmine Huff, and his father, Irving Richard. After obtaining Huff's permission to search the family's backyard, officers found seven .45 caliber spent casings and one live .45 caliber cartridge. Four of the spent casings were manufactured by Winchester, while the other three, as well as the live cartridge, were manufactured by Speer.

Detective Robert Chisholm interviewed Richard three times. The first interview began at 9 a.m. on July 17, 2010, with the detective advising Richard of his *Miranda* rights. Richard told the detective that he and Lane had been friends until they got into a dispute over a dog. He denied having any guns and said that he had not heard any shots fired the previous evening. Richard also denied that he had previously discharged a firearm in his yard or that he had called Lane to apologize for doing so, albeit he had no explanation for the shell casings found in his yard. Five and a half hours into the interview, Richard told Detective Chisholm that he was ill and needed to go to the

4

hospital, whereupon the detective stopped the interview and called Emergency Medical Services.

During that first interview, Richard had given consent for the police to search his home for guns, drugs, and evidence related to this crime. But Richard told the detective that only Irving had access to a storage area in the back of the house, and the detective relayed that information to the officers at the scene. In Richard's bedroom, the police found a box of ammunition containing twenty-nine .45 caliber semiautomatic cartridges manufactured by Speer and a gun case. Irving gave the officers permission to search a padlocked storage area on the enclosed back porch and provided the officers with a key for the padlock. Officers searched the storage area and located a .45 caliber gun manufactured by Haskell and a magazine. The magazine contained seven .45 caliber cartridges manufactured by Speer.

Upon Richard's release from the hospital and after reminding him of his *Miranda* rights, Detective Chisholm interviewed Richard for another 30 to 45 minutes. Richard admitted owning the gun that the detective said they had found at his house. Richard explained that he normally stored the loaded gun underneath his mattress. In response to the detective's query about the 14 rounds of ammunition missing from the box found in his house, Richard related that on a prior occasion he had fired the handgun into the air, after which he called Lane to explain what he had done. He also admitted shooting his gun on the Fourth of July and firing at a dog causing trouble in the neighborhood. Richard continued to deny hearing shots or shooting at Lane's house on the night of Lane's death. Richard eventually concluded the interview.

The next morning, at Richard's request, Detective Chisholm conducted another interview. After the detective had Richard read his *Miranda* rights aloud, Richard

5

admitted shooting his gun from Lane's backyard six times the night of Lane's death to send Lane a message to leave him alone.

The State charged Richard with one count of felony murder, based on the underlying felony of criminal discharge of a firearm at an occupied building, and one count of criminal possession of a firearm.

Sedgwick County Regional Forensic Science Center firearm and tool mark examiner Gary Miller opined that three of the spent casings from Richard's yard and all of the spent casings from Lane's yard came from Richard's gun. The other casings and live cartridges lacked sufficient identification markings to pair them with a particular firearm. Miller noted that the three bullet fragments found in Lane's home had the same class characteristics as ammunition that would be used in Richard's gun but could not definitively say if they were fired from Richard's handgun.

Richard testified in his own defense. He explained that on the day of Lane's death, he went over to a friend's house at around 7:30 p.m. to play cards. He stayed about 2 1/2 to 3 hours before returning home. When he got home, he went for a walk. Hoping to resolve his dispute with Lane, Richard stopped by Lane's residence to see if Lane was on his back porch where he usually sat. Lane was not outside, so Richard pulled his gun out and shot into the air. Richard then went home, put his gun away, and went across the street to talk to a friend.

Richard said he could not explain why he shot his gun in the air but said, "[A]s they stated, I was known to shoot my gun in the air at different times, so I did shoot the gun in the air." Richard stated that he shot five or six times but never shot the gun at the house. He explained that one of Lane's children was in the house, so he would have never shot at the house.

The jury convicted Richard as charged. Richard was sentenced to life with parole eligibility after 20 years for felony murder, consecutive to 19 months in prison for criminal possession of a firearm. Richard timely appealed his convictions.

K.S.A. 2010 SUPP. 60-455 EVIDENCE

Richard argues that the district court violated his right to a fair trial by permitting the State to introduce prior crimes evidence through testimony that established he had previously discharged his handgun in his backyard. After our decision in *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006), admission of all other crimes and civil wrongs evidence is governed by K.S.A. 2010 Supp. 60-455. See *State v. Everett*, 296 Kan. 1039, 1045, 297 P.3d 292 (2013) (quoting *Gunby*, 282 Kan. at 57). K.S.A. 2010 Supp. 60-455 provides in relevant part as follows:

> "(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.
> "(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Evidence of Richard's prior shooting incidents was presented through four witnesses. First, Officer Richardson related that Gonzalez-Lane had told him that the Lanes' neighbor to the south would occasionally shoot his handgun. Next, Gonzalez-Lane testified about the previous shooting incident where Richard had called Lane to explain that Richard was "just blowing off some steam." Third, Detective Chisholm described the

police interview in which Richard related that he had "fired one clip into the air one night" and then called Lane to advise him that Richard was just "letting a few off." The detective also testified about two other shooting incidents to which Richard had admitted, but Richard does not challenge that testimony in this appeal. Finally, Richard introduced the evidence through his own testimony. During Richard's direct testimony, he said, "[A]s they stated, I was known to shoot my gun in the air at different times." During cross-examination, he discussed the time he shot his gun to "see if it would work" and then called the Lanes to "let them know I was just letting off a few."

As a preliminary matter, the State contends that Richard's K.S.A. 2010 Supp. 60-455 argument is not preserved for appellate review because the defense failed to contemporaneously object to Detective Chisholm's testimony and to Richard's own testimony. The defense did contemporaneously object during the testimony of the first two witnesses, Richardson and Gonzalez-Lane, albeit the record does not reflect a request for a continuing objection or a renewal of the objection during the last two witnesses' testimony.

Under K.S.A. 60-404, "a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review." *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). "The purpose of the rule is to avoid the use of 'tainted evidence [and thereby] avoid possible reversal and a new trial.'" *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011) (quoting *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 [2010]). "Because an in limine ruling 'is subject to change when the case unfolds,' *Luce v. United States*, 469 U.S. 38, 41, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984), a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection." *State v. Inkelaar*, 293 Kan. 414, 421, 264 P.3d 81 (2011) (citing *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 [2010]).

Richard met those requirements with respect to the testimony of Officer Richardson and Gonzales-Lane and his challenge to the admission of their testimony about the specified prior shooting incident is preserved for our review. Because of our determination that the trial court did not err in admitting the evidence over the defense's objection, we need not ruminate on the effect of any failure to object to the later descriptions of the same incident. Instead, we proceed to the merits of Richard's argument.

In *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012) (citing *Inkelaar*, 293 Kan. at 424), we summarized the three-part *Gunby* test that a trial judge must use in determining whether to admit evidence under K.S.A. 60-455, and the corresponding appellate standards of review:

- "First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
- "Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.
- "Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion.

If the evidence meets all of these requirements, it is admitted, but in a jury trial the district court must give the jury a limiting instruction telling the jury the specific purpose

9

for which the evidence has been admitted (and reminding them that it may only be considered for that purpose)."

Beginning with whether the prior shooting evidence was material, Richard was charged with (1) first-degree felony murder based on the underlying felony of criminal discharge of a firearm at an occupied building that resulted in the death of Lane and (2) criminal possession of a firearm. First-degree felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 21-3401(b). Criminal discharge of a firearm at an occupied building is an inherently dangerous felony. K.S.A. 2010 Supp. 21-3436(a)(15). "Because the jury is presumed to have taken the elements of the underlying felony into account, as demonstrated by the jury's being instructed on those elements, relevance to an element of the predicate felony reasonably could be found to be sufficient for admissibility." *State v. Tolson*, 274 Kan. 558, 566, 56 P.3d 279 (2002). At the time of Lane's death, the statute prohibiting criminal discharge of a firearm at an occupied building defined the crime as "the malicious, intentional and unauthorized discharge of a firearm at a . . . building . . . in which there is a human being." K.S.A. 21-4219(b). The statute prohibiting criminal possession of a firearm defined the crime, in relevant part, as "possession of any firearm by a person who, within the preceding 10 years, has been convicted of . . . [a] felony." K.S.A. 2010 Supp. 21-4204(a)(4)(A).

The district court's on-the-record ruling on the admissibility of the prior shooting stated that the evidence addressed opportunity, intent, knowledge, and identity, but the district court's limiting instruction omitted intent from the purposes for which the jury could consider the prior shooting. Richard argues that the evidence was irrelevant to the issues identified in the limiting instruction—opportunity, knowledge, or identity— because it had no tendency to show that Richard knowingly fired shots at an occupied residence on the date Lane was killed.

10

We discern that the evidence was relevant for the purpose of proving two of the purposes contained in the limiting instruction, to-wit: knowledge and identity. The evidence was also admissible for the purpose of proving intent, even though that purpose was omitted from the limiting instruction.

First, we agree with the State's argument that the evidence of the prior shooting tended to show that Richard was aware of his wrongdoing, when the prior facts are compared to the present incident. We have previously noted that "[k]nowledge, which signifies an awareness of wrongdoing, is an element in crimes that require specific intent." *Tolson*, 274 Kan. at 565. Granted, we have held that the word "malicious" in our criminal discharge of a firearm statute does not require specific intent, but instead requires "a lack of justification." *In re M.A.S.*, No. 92,558, 2005 WL 3430738, at *3 (Kan. 2005) (unpublished opinion); see *State v. Mitchell*, No. 108,912, 2014 WL 113441, at *3 (Kan. App. 2014) (unpublished opinion), *petition for review filed* February 6, 2014. Nevertheless, the specific/general intent distinction is not always outcome determinative under K.S.A. 2010 Supp. 60-455. *State v. Boggs*, 287 Kan. 298, 314, 197 P.3d 441 (2008) (general/specific intent not crucial distinction for admitting other crimes evidence for purpose of intent).

Here, Richard's awareness of wrongdoing flows from a comparison of his post-shooting behavior. When he shot his handgun on the prior occasion, he did not hide the gun afterward and he called Lane to explain what he had done. After the shooting resulting in Lane's death, Richard hid the handgun in a locked storage area and denied that any shooting took place.

Additionally, as the State points out, the prior shooting helped explain to the jury why Gonzalez-Lane quickly identified Richard as a likely suspect. Moreover, the identity

11

of Lane's killer was a disputed, material fact in this case. See *State v. Garcia*, 285 Kan. 1, 14-15, 169 P.3d 1069 (2007). Although Richard eventually admitted shooting the gun on the night in question, he initially denied shooting at all and subsequently denied being the person who shot at the house. See *Garcia*, 285 Kan. at 14-15; see also *State v. Searles*, 246 Kan. 567, 579, 793 P.2d 724 (1990) ("The disputed material fact was whether or not the defendant was the one who committed the crime.").

Richard argues that the prior shooting was not sufficiently similar to the incident giving rise to the current charged offense to be relevant to show identity. In his view, the only similarity between the two events is the physical act of shooting a weapon. Our cases where prior crimes or civil wrongs are used to show identity have emphasized that while "'the evidence should disclose sufficient facts and circumstances of the other offense to raise a reasonable inference that the defendant committed both of the offenses," the evidence "need not be identical, only similar." *Garcia*, 285 Kan. at 15 (quoting *State v. Bly*, 215 Kan. 168, 177, 523 P.2d 397 [1974]); see *Searles*, 246 Kan. at 578. Here, there were more common threads between the incidents than just discharging a weapon. In both incidents, Richard gratuitously and without provocation fired the same weapon into the air from adjoining backyards in the same residential neighborhood, and the incidents were relatively close in time. The prior shooting made it more likely that Richard was the shooter than any other person who might have been suspected.

The evidence was also relevant to the issue of Richard's intent. Richard's previous discharge of his handgun into the air without striking any residence could indicate for the jury that Richard knew how to operate the weapon in such a manner as to avoid striking an occupied dwelling unless he wanted to do so, *i.e.*, the evidence was material to prove an absence of mistake by showing an absence of honest error. See *Boggs*, 287 Kan. at 312.

12

Richard's brief acknowledges that "[i]ntent in discharging the firearm on July 16, 2010 was the primary material issue at trial." But, citing to *State v. Marquez*, 222 Kan. 441, 447-48, 565 P.2d 245 (1977), he contends that we should not apply to K.S.A. 2010 Supp. 60-455 evidence the "right result-wrong reason" rationale that applies in cases involving the admission of other types of evidence, notwithstanding our recent cases. See *Boggs*, 287 Kan. at 310 ("a district court's admission of evidence under K.S.A. 60-455 may be upheld on review even if its rationale was in some way erroneous if an appellate court determines that the evidence was otherwise admissible under the statute") (citing *State v. Vasquez*, 287 Kan. 40, 51-53, 194 P.3d 563 [2008]); *State v. Reid*, 286 Kan. 494, 509-12, 186 P.3d 713 (2008). Here, though, the purposes for which the jury was instructed are intertwined with the admitted purpose that was omitted from the instruction. "'Both knowledge and absence of mistake are factors bearing on intent.' [*State v. Faulkner*,] 220 Kan. [153,] 156[, 551 P.2d 1247 (1976)]. While knowledge 'signifies awareness . . . ', absence of mistake 'simply denotes an absence of honest error.' 220 Kan. at 156." *Boggs*, 287 Kan. at 312. Accordingly, we find that the State has cleared the hurdle of showing the prior incident to be material to the current charge.

Likewise, as we have suggested above, the prior shooting evidence was probative because it provided a "tendency in reason" to prove that Richard intentionally shot at Lane's house. Furthermore, the district court did not abuse its discretion in determining that the probative value of this evidence was not outweighed by its prejudicial effect. Indeed, as the State points out, Richard himself embraced the evidence of the prior shooting to support his theory of defense that he just shot in the air, not at the house. In sum, we hold that the district court did not err in admitting the prior shooting evidence under K.S.A. 2010 Supp. 60-455.

Richard argues that the district court erred when it failed to grant his motion to suppress his post-*Miranda* statements to police as being involuntary. As noted, the police conducted three interviews, but Richard only challenges the voluntariness of the first interview. He claims that he was under the influence of drugs at that first interview. The district court denied the suppression motion, based principally upon watching the DVDs of the interviews. Specifically, the court found that Richard was "responsive to all questions" and that "[h]e was quite lucid and coherent."

The district court made its ruling at a pretrial suppression hearing. Richard's defense counsel did not engage in the formality of reasserting his client's objection to the voluntariness of his statements when they were introduced at trial. In fact, when the State moved to have the DVD of Richard's third interview played for the jury, his counsel specifically stated, "No objection." There is no indication that any of the parties was unclear about the court's position about allowing the introduction of Richard's statements at the trial, nor did the statements unfold in any unpredictable manner that would justify a change of heart by the court. Nevertheless, a majority of this court believes that a request for reconsideration of the district court's order on the suppression motion must be effected through a "contemporaneous objection" during the trial in order to preserve an appeal of the original ruling. Specifically,

> "we hold that when a pretrial motion to suppress has been denied, the evidence must also
> be objected to at the time it is offered during the trial in order to preserve the issue for
> appeal. This holding is also consistent with the language in K.S.A. 60-404—objection to
> the evidence must be 'timely interposed'—and consistent with this court's longstanding
> characterization of the statutory language as requiring a 'contemporaneous' objection.
> Among other advantages, this holding allows a court to rule on the evidence before trial,
> but after hearing how the evidence unfolds during trial, allows the court to be prepared—

14

after timely trial objection—to reconsider its original ruling. *Cf. Luce v. United States*, 469 U.S. 38, 41-42, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984) (in limine ruling 'is subject to change when the case unfolds')." *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009).

Based upon our precedent, Richard has failed to preserve his appeal of the district court's order denying his motion to suppress his post-*Miranda* statements to the police. See *State v. Tahah*, 293 Kan. 267, 280, 262 P.3d 1045 (2011) (defendant's failure to object at time confessions offered into evidence at trial "fatal" to appeal). He offers no reason for the court to revisit that precedent. In fact, his brief fails to acknowledge the preservation problem at all. Accordingly, we decline to consider this issue further.

MOTION TO SUPPRESS EVIDENCE FOUND DURING THE SEARCH OF RICHARD'S RESIDENCE

Richard next argues that the district court erred in denying his motion to suppress evidence found during a warrantless search of a locked storage area at his residence.

"[U]nder the Fourth and Fourteenth Amendments to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, a search conducted without a warrant is per se unreasonable, unless a specifically established exception applies. See *State v. Damm*, 246 Kan. 220, 221, 787 P.2d 1185 (1990). It is the State's burden to validate a warrantless search by fitting it within one of the recognized exceptions, which are: consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses. [Citation omitted.]" *State v. Johnson*, 297 Kan. 210, 223, 301 P.3d 287 (2013).

The police searched Richard's residence based upon the consent exception. During his first interview with Detective Chisholm, Richard said the police could search his residence but only Irving could give permission to search the locked storage area on the

back porch because Richard did not have access to that area. At the house, Irving gave the police oral consent to search the locked storage area and provided the police with a key to obtain entry.

Prior to trial, Richard filed a motion to suppress the evidence obtained during the warrantless search of his residence. After a hearing, the district court denied the motion. Richard also lodged a continuing objection at trial to the admission of evidence found during the search, arguing that the search was improper.

On appeal, Richard first asserts that the district court erred in finding that he lacked standing to challenge the search of the locked storage area at his residence. Richard then argues Irving's consent to search the locked storage area was involuntary.

At this point, we pause to note that Richard does not challenge the district court's finding that "it was quite clear to the Court that the defendant gave consent to search the residence except for the back room that was on the back porch." Nor does Richard complain about the district court's declaration that, pursuant to the "*Matlock* decision and subsequent case law[,] . . . [a] co-owner or co-occupant can give consent over the objection or limitation of another co-occupant's permission to search a residence." See *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). While not necessary to our ultimate decision in this case, we do note that the United States Supreme Court recently adhered to its *Matlock* holding. See *Fernandez v. California*, 571 U.S.___, 134 S. Ct. 1126, 1132-33, 188 L. Ed. 2d 25 (2014).

*Standing*

We begin with Richard's argument that the district court erred in finding that he did not have standing to challenge the search. The State counters that Richard has

misconstrued the district court's ruling; it ruled on the basis of consent, not standing. Nevertheless, standing to challenge a search is "a component of subject matter jurisdiction, which may be raised for the first time on appeal." *State v. Gilbert*, 292 Kan. 428, 431, 254 P.3d 1271 (2011). And it is an appellate court's duty to question jurisdiction on its own initiative. *State v. J.D.H.*, 48 Kan. App. 2d 454, 458, 294 P.3d 343, *rev. denied* 297 Kan. 1251 (2013). In doing so, we exercise unlimited review over the legal question of whether the defendant has standing to challenge the search, *Gilbert*, 292 Kan. at 431-32, but the defendant bears the burden of establishing standing. See *State v. Sumner*, 210 Kan. 802, 803-04, 504 P.2d 239 (1972) ("It has been held it is proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed, that he establish that he himself was the victim of an invasion of privacy."); *State v. Gonzalez*, 32 Kan. App. 2d 590, 593, 85 P.3d 711 (2004) ("On the issue of standing, the burden is on the defendant to show an expectation of privacy in the property searched.").

A person challenging the legality of a search must establish that he or she was the victim of an invasion of privacy. *State v. Epperson*, 237 Kan. 707, 716, 703 P.2d 761 (1985). "'To establish a sufficient interest, a movant must claim either to have a proprietary or possessory interest in the premises searched, or to have owned or possessed the seized property.'" 237 Kan. at 716 (quoting *State v. Boster*, 217 Kan. 618, 621, 539 P.2d 294 [1975]); see also *Gilbert*, 292 Kan. at 435-36 (noting vehicle passenger claimed no interest in property seized from vehicle before concluding passenger lacked standing); *State v. Hays*, No. 106,374, 2012 WL 6061556, at *3-4 (Kan. App. 2012) (unpublished opinion) (finding vehicle passenger had standing to challenge search because he owned seized property).

Richard eventually acknowledged that the handgun seized during the search belonged to him, and he told the detective that he coowned the residential property with

17

his father, Irving. Likewise, notwithstanding his suggestion to the contrary during the first interview, Richard claimed to have access to the area searched. Specifically, during his third police interview, Richard related that although Irving kept the key to the storage area's padlock, Irving normally left the area unlocked in case Richard needed access to the fuse box located within the area. And at the suppression hearing, Richard reiterated that he had access to the area and testified that both he and his father used the area for storage. So, while some of Richard's statements may have given rise to nuanced arguments calling into question his standing to challenge the search of his house to seize his handgun, we find sufficient evidence in the record to support the district court's jurisdiction to hear Richard's challenge to the warrantless search.

*Consent*

Richard next argues that Irving's consent to search the locked storage area was invalid because Irving lacked capacity to give a voluntary consent at the time of the police's request. Richard points to Irving's conduct at the suppression hearing as corroboration of his incapacity.

"'For a consent to search to be valid, two conditions must be met:  (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied.'" *State v. Ransom*, 289 Kan. 373, 381, 212 P.3d 203 (2009) (quoting *State v. Thompson*, 284 Kan. 763, 776, 166 P.3d 1015 [2007]). An "individual's mental state is also a factor in determining the voluntariness of his or her consent to search." *State v. Holmes*, 278 Kan. 603, 611, 102 P.3d 406 (2004) (citing *United States v. Watson*, 423 U.S. 411, 424-25, 96 S. Ct. 820, 46 L. Ed. 2d 598 [1976]). Voluntariness presents an issue of fact which is reviewed on appeal for substantial competent evidence. *Ransom*,

289 Kan. at 380. The State bears the burden of establishing voluntariness. 289 Kan. at 380.

After reviewing all the evidence, the district judge ruled:

"In this case, looking in part particularly at the testimony of Irving Richard and what consent he gave on July 17th of 2010, even today Mr. Richard states it was okay that the police searched his house. I understand that—there is some understanding by the Court that as he was here today, Irving's testimony might cause someone to raise some question about his coherency and understanding of everything that was going on. The Court would say that that is of little weight in terms of what Mr. Richard's condition is today considering his age of 81 and the passage of 13 months since the date of the search. What seems more clear to the Court [is] that the testimony provided supports that on July 17th of 2010, Irving Richard did give his approval and his consent to search the back room of the house. That was clear by his responses and actions.

"And the Court took specific note of the testimony that was given by Officer Weidner that when talking with the woman that was not identified and with Irving Richard on the day of the search, there was indication that when a key was requested in the process—or I'm not sure even that a key was requested. It seemed to come from—it may have come up from Mr. Irving Richard's mind himself that to be able to get into that room, a key needed to be provided. And that the testimony was that Mr. Richard, Irving Richard, went to the—back to his bedroom in the house, got a key ring, and from that key ring provided a specific key, which was the key that opened the lock on that—the padlock on the back [of the] residence. That would indicate to the Court that Mr. Irving Richard had a clear understanding at the time of what he was giving consent to when he located a key that worked for the padlock in the back room.

"The Court will deny the motion to suppress on the basis that consent was given by the defendant to most of the residence, . . . and that consent was given to the back room that was locked by Irving Richard."

The State argues Richard's claim amounts to nothing more than a request for this court to reweigh the evidence in his favor. We agree. The district court's findings were

based on substantial competent evidence, and, therefore, Richard is not entitled to relief on his claim that Irving's consent was involuntary.

Affirmed.

MORITZ, J., not participating.