NOT DESIGNATED FOR PUBLICATION

No. 119,680

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ZACHARY LAMONT GARDNER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Cowley District Court; NICHOLAS M. ST. PETER, judge. Opinion filed May 1, 2020.
Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Ian T. Otte*, deputy county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., HILL and STANDRIDGE, JJ.

PER CURIAM: A jury convicted Zachary Lamont Gardner of one count of reckless second-degree murder, a severity level 2 person felony. The district court sentenced Gardner to 123 months in prison. Gardner appeals, citing numerous trial errors. Finding no error, we affirm Gardner's conviction.

FACTS

The State charged Gardner with one count of intentional second-degree murder after his wife, Melissa Gardner, was found fatally shot in their home. The State's first

1

witness at trial was Amy Moore, Melissa's sister. Moore testified that on January 15, 2017, at approximately 1:30 in the afternoon, she stopped by the Gardners' house to pick up money so she could take the Gardners' two kids and a friend skating. Gardner took a while to answer the door, and when he did, he asked them to come back in 30 minutes because he thought Melissa had taken his wallet and needed time to find some money. Moore agreed. When she returned, Gardner gave his son and the son's friend each a $20 bill. Moore asked to speak with Melissa, but Gardner told her that Melissa was sleeping. Moore did not believe Gardner was in a good state of mind, but he appeared to understand what she was saying and answered all of her questions appropriately.

At around 6:30 that evening, Moore passed the Gardners' house while she was taking the friend home from skating and noticed that the hood of Melissa's car was up. This concerned Moore because it was raining. After dropping the child off at his house, Moore returned to the Gardners' to investigate and check on Melissa. When Moore pulled into the driveway, the screen door was closed, but the front door was open. She proceeded into the house and was yelling for Melissa when she came across a blanket covering something on the floor in the hallway. When she pulled back the blanket, Moore discovered Melissa lying stiff and motionless beneath it. Melissa's eyes and mouth were open, and her stomach was distended. Moore said she could tell that Melissa was dead, and she ran out of the house as fast as she could and called 911. Soon after the police arrived, Moore saw Gardner run up from the side of the house. As he was being subdued by police, Moore began to kick him and hit him to the point where she physically had to be picked up and separated from him.

The State's second witness was Winfield Police Officer David Dougherty. Officer Dougherty initially was called to the Gardners' house but then returned to the police department in order to interview Gardner. Officer Dougherty advised Gardner of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and then went over each of those rights individually to ensure that Gardner understood

them. Gardner ultimately waived his *Miranda* rights and agreed to make a statement to police. Relevant to this appeal, Gardner told Officer Dougherty that he retrieved a gun from his father early in the day on Saturday, January 14, 2017. After performing a complete functions check of the weapon, Gardner claimed he cleared it and placed it, unloaded, on top of the dresser in his bedroom. Officer Dougherty testified that he and Gardner were able to understand each other and converse without difficulty throughout the entire interview.

The State also called—over Gardner's objection—Rhett Whitley, Martin Moon, and Cory Johnson to testify as witnesses. All three of these individuals were correction officers who were working in the Cowley County Jail on the night of December 6, 2016, which would have been about six weeks before Melissa was found dead. Whitley testified that he heard a commotion in a holding cell near the booking desk and when he went to investigate, he heard Gardner say "that he was, [g]oing to kill that bitch. That's not a threat. That's a promise." Whitley was wearing a body camera at the time, but it was not activated so Gardner's statement was not recorded. Moon testified that he was in the process of booking Gardner—who he described as appearing angry, upset, and intoxicated—into the jail when he heard him say "I'm going to kill that bitch." He was wearing a body camera and, unlike Whitley, it was activated; but it did not pick up the specific threat that Moon testified to. It did, however, record Gardner using the word "bitch" in various other contexts. Finally, Johnson testified that he was with Moon in the booking area when he came into contact with Gardner and heard him say "that he was going to kill his wife as soon as he got out." Johnson's body camera was recording but, again, the video did not show Gardner making the specific threat that Johnson testified to. All three correction officers prepared reports about the incident, but the reports were not written until after Gardner was charged in this case.

Just before resting its case-in-chief, the State read the following stipulations into the record:

"The first stipulation says: The following facts have been agreed to by the parties and are to be considered by you as true. One, the following items were taken by law enforcement from the residence of [address omitted] Winfield, Kansas, the evening that Melissa's [*sic*] Cathleen Gardner was fatally shot, and were sent to the KBI forensic laboratory for ballistic analysis. One, A-1, fired Smith and Wesson 40 cal cartridge case. B-1, 40 cal Smith and Wesson semi-automatic pistol, model SD 40 DE, with magazine for the same. Two, the following item was taken from the body of Melissa Cathleen Gardner during autopsy by Ronald Disterfano—and that's D-I-S-T-E-R-F-A-N-O—of the Sedgwick County Regional Forensics Center and sent by law enforcement to ballistic analysis to the KBI laboratory, one fired bullet. The results of the analysis were as follows: A, the 40 caliber pistol was tested and found to be in working order. The 40 caliber cartridge was found to have been fired from the 40 caliber pistol. The bullet or the fired bullet was found to have been fired from the 40 caliber pistol.

"Second stipulation, the following facts have been agreed to by the parties and are to be considered by you as true: On January 17th of 2017, Dr. Ronald Disterfano, a duly qualified forensic medical examiner, performed an autopsy on the body of Melissa Cathleen Gardner. Two, there were two gunshot wounds found on the body, one of the left forearm and the other of the abdomen. Three, the gunshot wounds were considered to have resulted from a single projectile. Four, there was no evidence of close range gunfire. Five, blood analysis showed the presence of methamphetamine and amphetamine. Six, Dr. [Disterfano's] opinion regarding cause of death is that Melissa Cathleen Gardner died as a result of a gunshot wound to the abdomen. The gunshot wound first perforated her left forearm, fracturing her left mid radius. It then entered the abdomen, perforating the skin and the 9th rib cartilage antero-laterally, bowel mesentery, the aorta and the right kidney coming to rest in the subcutaneous tissues of the right lower back, where it was recovered. A large-caliber, jacketed, hollow-point projective was recovered from her lower back."

After the State rested, Gardner took the stand to testify in his own defense. He told the jury about his military experience and the mental and physical health conditions he has suffered as a result of his service. Gardner enlisted in the United States Army, on October 27, 2004, the day after he and Melissa got married. A little over a year later, Gardner was sent to Iraq. While in Iraq, Gardner was the lead driver of a scout platoon,

leading convoys of military vehicles past the front line in order to obtain information on the enemy. Gardner came into close contact with enemy combatants and witnessed death first-hand. During the approximately four months he was there, he was the victim of three separate improvised explosive device attacks. The third attack caused an injury that required amputation of his right foot, which rendered Gardner "non-deployable." For this reason, Gardner was discharged from the military in November 2006 with a 100 percent disability rating. Breaking down that rating, Gardner testified that 50 percent was based on his posttraumatic stress disorder (PTSD), 30 percent was the result of a traumatic brain injury, and the remaining 20 percent was based on the loss of his right foot.

After leaving the military, Gardner said his PTSD made him paranoid and "hypervigilant," which he described as being constantly alert as if he could get hurt at any time. Gardner also said that his PTSD made him startle easy and experience vivid nightmares, which disrupted his sleep. He recounted an incident that occurred about seven or eight years before the trial, when he began to involuntarily choke his son while they were both sleeping. Melissa had to strike Gardner in the head to make him come to his senses and realize what was going on. After that incident, Gardner kept a 5-foot-long body pillow between himself and Melissa when they went to sleep so that there would be some level of protection for her if he had another nightmare.

Gardner tried to treat his mental health issues with medication and counseling but eventually began self-medicating with illegal substances. On the weekend that Melissa was shot and killed, Gardner testified that they were both using methamphetamine and other drugs. He and the State agreed that the following facts would be presented to the jury in the form of a stipulation:

> "The following facts have been agreed to by the parties and are to be considered by you as true: One, on January 17 of 2017, the Winfield Police Department sent a vial of blood taken by medical personnel from Zachary Gardner to the Kansas Bureau of

Investigation forensics laboratory for analysis. Two, results of the analysis were as follows:  A, Zachary Gardner's blood tested positive for methamphetamine. B, Zachary Gardner's blood tested positive for amphetamine. C, Zachary Gardner's blood tested positive for benzodiazepines."

Gardner testified that, at some point in the evening on Saturday, January 14, 2017, two men came over to their house and began doing drugs with Melissa. Gardner said he did not like being around other people when he was high so he "took a handful of Clonopin" as a sedative. But before he lay down, Gardner collected some valuables and a handgun and placed them under his pillow. He said he did this because of his paranoia and hypervigilance and because he was uncomfortable with the two men being around his wife.

Gardner testified the handgun was a tactical weapon with a standard ejection port and that, other than a mechanism on the trigger, it did not have a safety that could be turned on and off. Gardner cleared the gun, put a gun lock on it, and placed it in a top drawer. But after getting high on Saturday, January 14, 2017, he got the gun back out, cleaned it, and loaded it with a magazine that contained one bullet. The gun was unlocked and loaded when he took it to bed with him.

Gardner heard a loud noise and/or a scream while he was sleeping, which he said triggered an exaggerated startle response. Without thinking or even fully coming awake, Gardner pointed his gun down the hallway and fired a shot. According to Gardner, it was only after firing the gun that he fully came to his senses and realized that he had shot Melissa. Gardner said he ran down the hallway, knelt down beside Melissa, and grabbed her head to try to make her look at him. When she did not respond, he tried to render aid by propping up her legs, fashioning a make-shift tourniquet, and administering a sternum rub. He then tried to administer CPR but "lost it" when his attempt at rescue breathing caused Melissa's wound to gurgle blood. Gardner said he began to experience flashbacks

6

to his time in the military. Over the next few hours, Gardner walked around the house as if he were numb. He said that he tried several times to find a working cell phone or keys to a vehicle so that he could get help but quickly gave up on those tasks and reverted back to not knowing what to do. Gardner admitted that he did not handle the situation properly.

After the defense rested, the district court held a jury instructions conference. Relevant here, Gardner requested a voluntary intoxication instruction. The district court took the matter under advisement but ultimately denied the request on grounds that it was factually inappropriate. The jury returned a guilty verdict on the lesser included offense of unintentional but reckless second-degree murder with extreme indifference. Gardner filed a number of posttrial motions, which the court denied.

ANALYSIS

On appeal, Gardner raises five points of error:  (1) There was insufficient evidence to support his conviction, (2) the prosecutor committed reversible error during his closing argument, (3) the district court erred when it refused to give a voluntary intoxication instruction after finding that it was factually inappropriate, (4) the district court erred when it allowed three jailers to testify regarding comments Gardner made in jail, and (5) cumulative error deprived him of a fair trial.

1. *Sufficiency of the evidence*

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

7

It is only in rare cases, where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt, that a guilty verdict will be reversed. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018). In addition, a verdict for even the gravest offense can be based entirely on circumstantial evidence if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). There is no legal distinction between direct and circumstantial in terms of their probative value; and circumstantial evidence need not exclude every other reasonable conclusion in order to be sufficient. 304 Kan. at 25; see also *State v. Lowery*, 308 Kan. 1183, 1236, 427 P.3d 865 (2018).

To obtain a conviction for reckless second-degree murder, the burden was on the State to prove beyond a reasonable doubt that Gardner: (1) killed Melissa and (2) acted recklessly under circumstances manifesting an extreme indifference to the value of human life. See K.S.A. 2019 Supp. 21-5403(a). Gardner does not dispute that he shot and killed Melissa. As such, we need only determine whether there is sufficient evidence to support the jury's finding that Gardner acted recklessly, with extreme indifference to the value of human life. See K.S.A. 2019 Supp. 21-5403(a)(2). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j).

Gardner argues there was no evidence presented at trial to show that he was "horsing around" with the gun, that he intended to display force, or that he intended to injure or kill Melissa. But while those factual characteristics have been present in previous reckless second-degree murder cases, they are not elements that are required by statute. See K.S.A. 2019 Supp. 21-5403(a); see also *State v. Gonzalez*, 307 Kan. 575, 587-88, 412 P.3d 968 (2018); *State v. Cordray*, 277 Kan. 43, 55-56, 82 P.3d 503 (2004).

8

Instead, K.S.A. 2019 Supp. 21-5403(a)(2) requires the State to prove only that Gardner acted recklessly, with extreme indifference to the value of human life. When viewed in a light most favorable to the prosecution, the evidence presented at trial establishes that (1) Gardner knew that he had mental health issues that caused him to experience an exaggerated response when startled, (2) Gardner knew that he had hurt people in the past while sleeping and because of that generally took precautions to prevent similar incidents from occurring, and (3) despite knowing these things about himself, Gardner took a loaded gun without a true safety mechanism to bed with him while there were other people in the house. This evidence is sufficient to support the jury's conclusion that Gardner acted recklessly, with extreme indifference to the value of human life.

2. *Prosecutorial error*

Gardner next argues that the prosecutor committed reversible error during his closing argument. Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

9

a. *Error*

Kolter makes four claims of prosecutorial error, all of which arise from the prosecutor's closing argument. We address each claim in turn.

### (1) *Appealing to passions and prejudices of jury*

Gardner claims that the prosecutor committed reversible error by improperly appealing to the passions and prejudices of the jury. A prosecutor has a duty to ensure that the State's case is presented with the proper amount of earnestness and vigor and therefore, as noted above, is granted wide latitude to use every legitimate means to argue the case and bring about a conviction. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009); see also *Sherman*, 305 Kan. at 109. But a prosecutor also serves as an officer of the court, occupying a quasi-judicial role with its own traditions and responsibilities. *State v. Martinez*, 290 Kan. 992, 1014, 236 P.3d 481 (2010). A "prosecutor crosses the line of appropriate argument when that argument is intended to inflame the jury's passions or prejudices or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law." 290 Kan. at 1014-15; see also *State v. Holt*, 300 Kan. 985, 999, 336 P.3d 312 (2014) (A prosecutor steps over the bounds of permissible argument when he or she asks for justice for a specific victim as opposed to justice in general.).

Here, Gardner complains that the prosecutor improperly sought to inflame the passions and prejudices of the jury when, as he opened his closing argument, he stated:

> "On the day that the defendant testifies, as you were told earlier, he did not have to testify. If you chose to—we spent a lot of time talking with that person, and I just want to bring you back to your thoughts this morning, back this afternoon, to Melissa Cathleen Gardner. She's the victim in this case. She's the one that made paid the ultimate price. She's the one, why you are here. I want to remind you of that."

Gardner also complains of the prosecutor's comment at the conclusion of his initial closing argument, where he stated: "I stand on behalf of Melissa and what I believe justice is in this case and ask you to be strong through your deliberations and to come back with a guilty verdict, murder in the second degree, intentional." The State concedes, and we find, that both of these comments constituted error because each sought to divert the jury from the evidence so as to obtain a conviction based upon sympathy for Melissa. See *Holt*, 300 Kan. at 999; see also *Chandler*, 307 Kan. at 678-79.

### (2) *Facts not in evidence*

Gardner claims the prosecutor committed reversible error by commenting on facts not in evidence. Kansas courts repeatedly have held "that in closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence." *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011); see also *State v. Warledo*, 286 Kan. 927, 947, 190 P.3d 937 (2008) ("A prosecutor 'is given wide latitude in language and in manner [of] presentation of closing argument as long as the argument is consistent with the evidence.'"). As such, when a prosecutor argues facts not in evidence, he or she exceeds the wide bounds of acceptable argument and the first prong of the prosecutorial error test is met. See *Chandler*, 307 Kan. at 678-79; *Hall*, 292 Kan. at 848.

Here, Gardner complains that the prosecutor misstated the evidence twice during closing argument. Gardner alleges the first instance occurred when the prosecutor misrepresented Officer Dougherty's testimony:

> "So the first account is going to be, Well, the gun was unloaded. So this must be some kind of accident. Well, then somewhere in the course of talking to Officer Dougherty, that changed. It became, Well, I put one bullet in the magazine. Well, in that, he was pressed on that a little bit, and it wasn't the magazine. It was actually the chamber itself. Like I said, the third story."

Gardner alleges the second instance occurred when the prosecutor misrepresented Gardner's own testimony: "[Gardner] said he was standing." The State concedes, and we find, that neither of these comments were supported by the evidence introduced at trial. Therefore, the prosecutor's statements constituted error, i.e., were outside the wide latitude afforded to prosecutors. See *Chandler*, 307 Kan. at 678-79; *Hall*, 292 Kan. at 848.

(3) *Inference stacking*

Gardner claims the prosecutor committed error by inviting the jury to make unreasonable and impermissible inferences. He complains that the following statement constituted improper inference stacking on the part of the prosecutor:

"I want you to consider all these things. I want you to think about it. I want you to come to the conclusion that his state of mind certainly was the state of mind of the defendant when you come back to Exhibit 23 and take a look at that. You ask yourself, Why did Melissa have an arm up? He said he was standing. What's the difference? If I were [to] toss you a softball, you'd react. You'd have time to bring your hands up. Your common sense tells you, once the gun goes off, you've got . . . no time to react. What does that tell you? That tells you that arm was already up. That arm was up. That tells you Melissa saw in advance what was coming, and that arm was up. Nobody walks around like this for no reason at all. Take a look at it. Nobody does that. So why did Melissa do it? She saw the gun. She saw a gun. That means there was time. It means the defendant raised that gun, and he raised that gun on purpose. Fired that gun on purpose. And left the marks that you will see here."

Inference stacking occurs when a case relies "upon the theory that presumption A leads to presumption B leads to presumption C leads to fact D." *State v. Banks*, 306 Kan. 854, 861, 397 P.3d 1195 (2017). But that is not what happened here. Instead, given that the bullet went through Melissa's raised arm and into her torso, the prosecutor's argument is grounded in the theory that presumption A (Melissa saw what was coming/saw the gun)

12

and presumption B (Gardner raised and then fired the gun), both separately point to fact C (Gardner acted intentionally). See 306 Kan. at 861 ("[I]t is perfectly proper for the State's case to be grounded upon a theory that presumption A, presumption B, and presumption C all separately point to fact D."). We find the prosecutor's comments were based on direct evidence and a request that the jury draw reasonable inferences from that direct evidence; accordingly, the statements did not constitute error. See 306 Kan. at 863.

### (4) *Witness credibility*

Gardner claims the prosecutor erred by impermissibly commenting on the credibility of witnesses. In Kansas, it is well established that a prosecutor may not offer his or her personal opinion about the credibility of witnesses. *State v. Sean*, 306 Kan. 963, 979, 399 P.3d 168 (2017). This rule applies to defendants as well, meaning that a prosecutor commits error if he or she—either directly or indirectly—describes the defendant as liar. *State v. Williams*, 303 Kan. 585, 602, 363 P.3d 1101 (2016). Similarly, a prosecutor is prohibited from making comments intended to bolster the credibility of his or her own witnesses. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015). What a prosecutor can do, however, is craft an argument that draws reasonable inferences from the evidence and explains to jurors what they should look for when assessing witness credibility. This is particularly true when the defense has attacked the credibility of the State's witnesses. *Sean*, 306 Kan. at 979.

Gardner complains that the prosecutor improperly commented on his credibility and also sought to bolster the credibility of Officer Dougherty when he stated:

"Now, I know that the defendant presented to you today his honorable service. I think that would great, his service. There's nothing wrong with saying that. Nothing wrong with saying that. We ought to – when somebody receives – especially injured – we say, Thank you. It's okay to have sympathy for some of the things. We have to come back and say, That was then. Some of those effects probably are still today. But what happened

13

last year? What really happened? What was his state of mind at that time? Everyone that came in contact with him, I specifically asked them, you remember, they said he understood them, they understood him. He had communication. He was given *Miranda* warnings. He said he understood. He marked them all off. He signed for them. The only time his memory failed today is whenever it came right up to a point something very important. Then, all of a sudden, I don't remember if I told Officer Dougherty that or not. Did you notice that? I don't know if I said that wrong. There was a lot of, I don't knows. I had to ask him. His memory, he admitted it, wasn't as good today as it was when he talked to Officer Dougherty. So you ought to give what Officer Dougherty said that the defendant told him more weight than what the defendant said today, because Officer Dougherty took it down shortly after this. Defendant gives detail after detail after detail what happens. He gives accounts what happened. There's nothing wrong with his mind at that time."

By highlighting his "limited recollection of events" and encouraging the jury to give "more weight" to Officer Dougherty's testimony, Gardner argues the prosecutor simultaneously bolstered Officer Dougherty's testimony and indirectly called Gardner a liar. But when read in context, the prosecutor's statements do not, as Gardner suggests, improperly comment on witness credibility. Rather, they simply ask the jury to draw reasonable inferences from the evidence presented at trial. See *Sean*, 306 Kan. at 979. The prosecutor invites the jury to look at Gardner's own admission that his memory was better on the day of the shooting and draw an inference from that admission that (1) Officer Dougherty's testimony regarding what Gardner said on the day of the shooting is more credible than Gardner's testimony at trial and (2) Gardner was in a lucid and coherent state of mind when he shot and killed Melissa. See *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (A prosecutor's explicit comments about witness credibility were not improper because they were reasonable inference based on the evidence at trial and the prosecutor direct the jury to that evidence.); *State v. Davis*, 275 Kan. 107, 122-23, 61 P.3d 701 (2003) (A prosecutor's statement that a witness should be believed and was more likely to tell the truth in an earlier police interview was a reasonable inference based on the evidence.). We find the prosecutor's comments did not

14

fall outside the wide latitude afforded to the State to conduct its case and obtain a conviction. See *Sherman*, 305 Kan. at 109.

b. *Harmlessness*

Having established that the State committed prosecutorial error by improperly appealing to the passions and prejudices of the jury and commenting on facts not in evidence, we now must determine whether those errors denied Gardner his right to a fair trial. As noted above, appellate courts adopt the traditional constitutional harmlessness inquiry when evaluating prejudice. See *Sherman*, 305 Kan. 109. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

The State asserts that, although the prosecutor did err during his closing argument, it was harmless. Specifically, the State argues that the jury was properly instructed: (1) to disregard any statements that were not supported by the evidence and (2) that the statements, arguments, and remarks of counsel, while intended to help it understand the evidence and apply the law, were not themselves evidence. As the State notes, we must presume that the jury followed the instructions provided by the court. In this particular case, that presumption serves to mitigate any damage caused by the prosecutor's comments. See *State v. Kettler*, 299 Kan. 448, 478, 325 P.3d 1075 (2014). And as it pertains to the statements that may have inflamed the passions and prejudices of the jury, the statements at issue were brief and followed by reminders that the State bears the burden of proving that Gardner was guilty beyond a reasonable doubt. Similarly, as it pertains to the comments on facts not in evidence, the complained of statements were again brief, were made in passing, and were not emphasized by the State. And finally, when compared with the overwhelming evidence in the record against Gardner, including

his own admission that he went to bed with a loaded gun, which created the dangerous situation that result in Melissa's death, there is no reasonable possibility that the errors complained of contributed to the verdict. See *Sherman*, 305 Kan. at 111 ("[T]he strength of the evidence against the defendant may secondarily impact [the] analysis one way or the other."). As a result, we conclude that, although errors did occur, they were harmless and did not prejudice Gardner's due process rights to a fair trial. See 305 Kan. at 109.

3. *Voluntary intoxication instruction*

Gardner argues the district court erred when it refused to give the following voluntary intoxication jury instruction that he requested:

> "Voluntary intoxication may be a defense to the charge of Murder in the Second Degree (intentional), when such intoxication impaired the defendant's mental faculties to the extent that he was incapable of forming the necessary intent to kill Melissa Cathleen Gardner."

That instruction is a modified version of PIK Crim. 4th 52.060 (2012) which is, in turn, based on the language of K.S.A. 2019 Supp. 21-5205(b).

When analyzing jury instruction issues, appellate courts follow a four-step progression:

> "First, it considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, it applies unlimited review to determine whether the instruction was legally appropriate; then, it determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, this court determines whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

16

*denied* 565 U.S. 1221 (2012). [Citation omitted.]" *State v. Claerhout*, 310 Kan. 924, 935-36, 453 P.3d 855 (2019).

Because it is dispositive of the issue, we limit our analysis to the third step of the inquiry: whether the requested instruction was factually appropriate. See *Claerhout*, 310 Kan. at 936-37.

Generally, a defendant is entitled to instructions on the law applicable to his or her theory of defense "if the evidence suffices for a rational factfinder to find for the defendant on that theory." 310 Kan. at 936. But simply showing that a defendant consumed an intoxicant around the time that he or she committed a crime does not automatically mean that a voluntary intoxication instruction is necessary. *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 (2015). Instead, a voluntary intoxication instruction is only required when either "the State or the defendant presents sufficient evidence showing intoxication to the extent of impairing the ability to form the requisite intent." *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353 (2014). Appellate courts "'will not infer impairment based on evidence of consumption alone.'" *State v. Hilt*, 299 Kan. 176, 193, 322 P.3d 367 (2014). But if a defendant can demonstrate an inability to recall events before or during the offense, or intoxication to the point that he or she lost the ability to reason, to plan, or to exercise basic motor skills, that may be enough to compel a voluntary intoxication jury instruction. *State v. Becker*, 311 Kan. __, 459 P.3d 173, 184 (2020); *Reed*, 302 Kan. at 400; *Betancourt*, 299 Kan. at 141.

Here, Gardner argues "there was some evidence on the record that [he] was effected by his intoxication to the point of being unable to form a specific intent." He asserts the following facts establish that his voluntary intoxication impaired his ability to form the requisite intent: he was unaware that he had fired the gun until after the act occurred, he reacted to seeing the blood gurgling from Melissa's wounds by walking around the house numb, and he was unable to remember what he was doing outside when

17

law enforcement arrived. But at trial, Gardner attributed each of these behaviors to his PTSD and the military flashbacks he was experiencing, not his drug use. While it is true that Gardner consumed methamphetamine and took a "handful of Clonopin" in the hours before he shot and killed Melissa, there is almost no evidence that he was intoxicated at the time of the shooting. By contrast, the record is replete with evidence demonstrating that Gardner could recall the shooting in great detail and had not lost the ability to reason or exercise basic motor skills. See *State v. Davis*, 306 Kan. 400, 414-15, 394 P.3d 817 (2017) ("A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction."). This included Gardner's own testimony as well as the testimony of many other witnesses who all indicated that Gardner was coherent and understood what was going on and what he was doing on the day of the shooting. When viewed in a light most favorable to Gardner, the evidence established Gardner ingested an intoxicant but was not intoxicated to the point that he lacked the ability to form the requisite intent. See *Hilt*, 299 Kan. at 193 (Appellate courts "will not infer impairment based on evidence of consumption alone."). Therefore a voluntary intoxication instruction was not factually appropriate, and the district court did not err when it refused to give Gardner's requested instruction. See *State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012).

4. *Other crimes or wrongs*

Gardner argues the district court erred when it allowed three jailers to testify about a threat he allegedly made against Melissa less than two months before he shot and killed her. The admissibility of evidence regarding other crimes and civil wrongs is governed by K.S.A. 2019 Supp. 60-455. That statute provides, in relevant part:

> "(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such

18

person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2019 Supp. 60-455.

When determining whether to admit evidence under K.S.A. 2019 Supp. 60-455, district courts must use the following three-part test with corresponding appellate standards of review:

- "'First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
- 'Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.
- 'Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion.'" *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014).

Here, Gardner only takes issue with the district court's determination at the third step: that the probative value outweighed the potential for undue prejudice. He argues the testimony of the jailers was wholly inconsistent, and as a result, was not probative. "Evidence is probative if it has any tendency in reason to prove the fact." *State v. Lloyd*, 299 Kan. 620, 639, 325 P.3d 1122 (2014). This court reviews for abuse of discretion a district court's determination regarding the probative value of evidence. *Richard*, 300

Kan. at 721; *Lloyd*, 299 Kan. at 639. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

We are not persuaded by Gardner's argument that the testimony of the three different jailers was so inconsistent it resulted in the evidence having little to no probative value. While it is true that none of the jailers documented the incident until six weeks after it occurred and that each gave a different version of the exact phrase that Gardner used, all three accounts were factually consistent with one another and the wording discrepancies were simply slight variations on the phrase "I'm going to kill that bitch." And contrary to Gardner's claim, the threat that Gardner purportedly made less than two months before he shot and killed Melissa is highly probative because it tends to prove his intent to do so. See *Lloyd*, 299 Kan. at 639. The district court did not abuse its discretion when it determined that the probative value of the jailers' testimony outweighed the prejudicial effect and allowed it to be introduced into evidence under K.S.A. 2019 Supp. 60-455(b). See *Richard*, 300 Kan. at 721.

5. *Cumulative error*

Gardner asserts his conviction must be vacated and his case remanded for a new trial because cumulative error deprived him of a fair trial. "The test for cumulative error is '"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."'" *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016). Here, Gardner has shown that the prosecutor committed two errors during his closing argument when he improperly appealed to the passions and prejudices of the jury and commented on facts not in evidence. But we have concluded that both of these errors were harmless because there is no reasonable possibility that either contributed to the verdict. See *Sherman*, 305 Kan. at

20

109. Given the nature and relationship of the errors, the context in which they occurred, and the overwhelming nature of the evidence against Gardner, we find that cumulative error did not deny Gardner a fair trial. See *Walker*, 304 Kan. at 458; see also *State v. Williams*, 308 Kan. 1439, 1462-63, 430 P.3d 448 (2018).

Affirmed.