IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,535

STATE OF KANSAS,
*Appellee*,

v.

RICHARD DANIEL SHOWALTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

To establish witness unavailability under the K.S.A. 2022 Supp. 60-460(c)(2) hearsay exception for depositions and prior testimony, the party seeking to introduce the deposition or prior testimony must show it acted in good faith and made a diligent effort to secure the witness' attendance at trial.

2.

The K.S.A. 2022 Supp. 60-460(c)(1) hearsay exception for depositions does not require a showing of unavailability, so the party seeking to introduce the deposition under this exception need not show it acted in good faith or made a diligent effort to secure the witness' attendance at trial. Subject to other rules of evidence, when a deposition testimony taken in a criminal trial qualifies as a hearsay exception because it was taken for use in the trial of the action in which it is offered, the party seeking to introduce it must only show (1) the witness is out of the state and the witness' appearance cannot be obtained, unless the offering party procured the witness' absence; or (2) the party offering the deposition has been unable to procure the attendance of the witness by subpoena or other process.

1

3.

Hearsay testimonial evidence in criminal prosecutions is admissible under the Confrontation Clause of the Sixth Amendment only when (1) the witness is unavailable, and (2) the accused had a prior opportunity to cross-examine the witness.

4.

A witness is unavailable for Confrontation Clause purposes only if prosecutorial authorities have made a good-faith effort to obtain the witness' presence at trial. Constitutional provisions do not require the doing of a futile act, and the lengths to which the prosecution must go to produce a witness is a question of reasonableness.

5.

A witness residing in a foreign country is necessarily unavailable for purposes of the Confrontation Clause.

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Oral argument held September 11, 2023. Opinion filed February 23, 2024. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause and was on the brief for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  This is Richard Daniel Showalter's direct appeal following his convictions for two counts of first-degree premeditated murder for the deaths of Lisa Sportsman and her 17-year-old cousin, J.P., and one count each of conspiracy to commit first-degree murder and aggravated burglary. Showalter argues the district court erred by:

(1) admitting autopsy photographs into evidence, (2) admitting the deposition of an unavailable witness into evidence, and (3) admitting certain statements made by one of Showalter's co-conspirators into evidence. Showalter also contends the cumulative effect of these alleged errors violated his constitutional right to a fair trial. But Showalter failed to preserve his objections to all but one of the autopsy photographs, and for the one he did preserve, the prejudicial effect did not outweigh its probative value. Moreover, the district court properly found the State made sufficient efforts to establish the forensic pathologist—who had moved to New Zealand—was unavailable to testify at trial and thus did not err in admitting his deposition testimony into evidence. Finally, Showalter failed to preserve his evidentiary challenge to his co-conspirator's statements. As a result, there are no errors to accumulate.

FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2018, Ju. P. tried unsuccessfully to contact her niece, Lisa Sportsman, and her 17-year-old son, J.P., who had spent the previous night at Lisa's house in Topeka, Kansas. Ju. P. texted Lisa and called J.P. several times. After failing to reach them, Ju. P. went to Lisa's house and knocked on the doors and windows. Ju. P. left after no one answered but later returned after she was still unable to reach Lisa or J.P. by phone. Lisa's front and back doors were both locked. At the back of the house, the screens on two bedroom windows had been cut. Ju. P. opened a window and went inside. Once inside, she discovered Lisa and J.P. on the floor, beaten and stabbed to death.

When law enforcement responded to the scene, Ju. P. told them she believed Lisa's estranged husband, Brad Sportsman, had killed Lisa and J.P. A few weeks before her death, Lisa moved to Topeka from Greenleaf, Kansas, where she had lived with Sportsman and his mother, Dema Diederich, in Diederich's house. Several others also lived there, including Lisa's niece and nephew, who Lisa had adopted. Showalter, Matthew Hutto, and Cole Pingel also lived at Diederich's house. In June 2018, Lisa asked

3

Ju. P. to help her leave Sportsman because Lisa did not want to be involved with drugs anymore. Ju. P. brought Lisa and the children to Topeka, where they stayed with Ju. P. for a short time. Sportsman later took the children back to Diederich's house in Greenleaf, and Lisa moved into the Topeka home where she was killed. Ju. P. said Lisa feared Sportsman, who had told Lisa "he was gonna take her out if she had the police come down there and get the kids."

Ju. P. told law enforcement that the day before the murders, Lisa said Sportsman was coming to "check out the house." Ju. P. saw Sportsman leaving Lisa's house and saw Showalter, Hutto, and Pingel standing in front of the yard. Lisa observed that Sportsman and Showalter were wearing all black clothing and that Showalter had a knife in his belt loop. Lisa told Ju. P. that Sportsman planned to come back later that night to bring her some money.

While Ju. P. was talking with law enforcement about the events leading up to the murders, a blue pickup truck belonging to Sportsman's mother drove by. At some point after Ju. P. identified the passing truck to officers, law enforcement located and stopped the truck on a westbound highway in Topeka. Sportsman was driving the truck with Showalter, Hutto, and Pingel as passengers. Law enforcement arrested the four men.

During an interview with law enforcement, Showalter said the men had come to Topeka to look at the condition of Lisa's house and make sure she would not get the kids back. He said they left after walking around the house for five minutes. When asked about Lisa's death and why the men did not stop to find out what happened, Showalter said he never liked Lisa, he "put up with her and tolerated her," and he did not care what happened to her. During the interview, Showalter also referred to Lisa as a "stupid bitch" and said she did not know when to keep her mouth shut.

4

When Pingel first spoke with law enforcement, he said the men had just come to Topeka that morning, July 23, around 3 a.m. But Pingel later admitted they went to Lisa's house in Topeka on July 20 so Sportsman could talk to her, but she was not home. Pingel said the men returned to Topeka on July 22 to "take care of business," which he explained meant killing Lisa. Pingel said Sportsman told Showalter and Hutto to kill Lisa, but he denied knowing why Sportsman wanted her killed. Pingel later hinted at a potential motive—he said Sportsman claimed membership in the MS-13 gang and answered to a boss named Penny. Pingel said Lisa talked a lot, could not keep her mouth shut, and "had been telling everyone about the MS-13."

Pingel claimed he did not want to be part of the plan to kill Lisa and did not initially believe the men would kill her. When they arrived in Topeka, Pingel said the men went to a Kwik Shop and then to the Econo Lodge Motel, where Sportsman and Hutto bought methamphetamine and they all discussed the plan to kill Lisa. Sportsman instructed Showalter and Hutto to knock on Lisa's door and rush in when someone answered. He told them to get in and out quickly and not disturb the house. After giving these instructions, Sportsman and Pingel dropped off Showalter and Hutto near Lisa's house and then went to a nearby Kwik Shop where they agreed to meet up afterward. The Kwik Shop was close to a wooded area with a footbridge leading to a street by Lisa's house. Pingel said Showalter had a hammer when they dropped him off. According to Pingel, Showalter returned to the truck with a hammer and a knife and was sweaty, breathing heavily, and had blood on his upper chest and neck. Pingel said they then drove to an area near Forbes Field, where Showalter and Hutto changed clothes and put their dirty clothes in a grocery bag.

Law enforcement searched Sportsman's truck and discovered a pair of black pants, a belt, a black t-shirt, two pairs of black shoes (one with duct tape on the soles), a roll of duct tape, blue nitrile gloves, a receipt from Dollar General, a hammer, a knife, and three baggies of methamphetamine. Testing revealed blood on the clothing and shoes. These

5

items contained a mixture of DNA from multiple individuals, including Lisa and J.P. The pants and one pair of the shoes contained a partial major male DNA haplotype consistent with Showalter or his biological male relatives. Law enforcement later located a second pair of black pants in the wooded area where Pingel said Showalter and Hutto changed clothes.

During its investigation, law enforcement received information from Dominick Ford, Showalter's cellmate at the Shawnee County Jail. Ford claimed Showalter told him the location of the weapons used to kill Lisa and J.P. Ford said Showalter wanted him to use this information as leverage to get released from jail so Ford could kill Pingel and find an alibi witness willing to place Showalter somewhere other than Lisa's house at the time of the murders. Ford said the weapons could be found in the same wooded area where law enforcement had found the second pair of black pants. Based on this information, law enforcement conducted another search of the area in March 2019. Near a tree, they found two sheathed knives wrapped in a black dress shirt.

The State charged Sportsman, Showalter, Hutto, and Pingel with various crimes related to the murders. Relevant to this appeal, the State charged Showalter with two counts of first-degree premeditated murder and two alternative counts of felony murder. The State also charged Showalter with one count each of conspiracy to commit first-degree murder, aggravated burglary, attempted first-degree murder, possession of methamphetamine, solicitation to commit first-degree murder, and aggravated intimidation of a witness.

The State presented the evidence outlined above to a jury at trial. In addition, the jury heard testimony from several witnesses about Showalter's relationship with Sportsman. Witnesses testified Sportsman was a leader who imposed his will on others, and Showalter did anything Sportsman asked him to do. Showalter even described himself as "Brad's enforcer" and said he did Sportsman's "dirty work." Witnesses also

testified Sportsman hated Lisa, the two had a rocky relationship, and the children were a point of contention between them. Witnesses reported Lisa was afraid of Sportsman and was scared he would hurt her and take the children. Several witnesses testified about Sportsman's claimed membership in MS-13 and his boss Penny. About a week before the murders, Sportsman told Diederich, his mother, that his boss Penny told him he or Lisa would have to die, and Sportsman would have to decide who it would be. Diederich claimed that soon after, she saw Sportsman talking to Showalter and heard Showalter say, "'I don't have a problem killing the bitch.'" Although scared, Diederich did not think Sportsman would kill Lisa.

The jury found Showalter guilty of both counts of premeditated first-degree murder, both alternative counts of felony murder, conspiracy to commit first-degree murder, and aggravated burglary. The jury found Showalter not guilty of the remaining charges. At sentencing, the district court merged the felony murder convictions with the premeditated first-degree murder convictions and sentenced Showalter to two consecutive hard 50 life sentences. The court also imposed a consecutive 146-month term of imprisonment for the conspiracy conviction and a concurrent 41-month term of imprisonment for aggravated burglary.

This is Showalter's direct appeal. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2022 Supp. 22-3601); K.S.A. 2022 Supp. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 2022 Supp. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

Showalter claims the district court erred by (1) admitting autopsy photographs into evidence; (2) declaring the forensic pathologist, who had moved to New Zealand,

7

unavailable to testify at trial and admitting his deposition testimony into evidence; and (3) admitting Sportsman's statements claiming membership in MS-13 into evidence. Showalter also contends the cumulative effect of these alleged errors deprived him of his constitutional right to a fair trial. We address each of Showalter's claims in turn.

1.  *Autopsy photographs*

Showalter claims the district court erred by admitting 10 autopsy photographs, marked as Exhibits 126-135, into evidence at trial. He claims these photographs were gruesome, repetitious, and prejudicial to his defense, serving only to inflame the passions of the jury.

a.  *Additional relevant facts*

Before trial, Showalter filed a "Motion to Exclude Gruesome Photographs" covering graphic photographs that the State intended to introduce at trial, including the autopsy photographs. The State opposed the motion, arguing the photographs were relevant to show the cause and manner of the victims' deaths and to establish the two intruders, armed with a knife and hammer, killed the victims intentionally and with premeditation.

At a pretrial hearing on the motion, the district court asked defense counsel to identify—by exhibit number—the gruesome and prejudicial photographs from the autopsy Showalter sought to exclude. In response, counsel specifically identified the 32 autopsy photographs presented in Exhibits 112-113, 115-121, 125-126, 139-140, 145-147, 149-157, 159-162, 166, 168, and 170. Relevant here, defense counsel did not identify as gruesome or prejudicial the autopsy photographs in Exhibits 127-135 and did not argue they should be excluded at trial for that or any other reason.

The parties presented their arguments on each individual autopsy photograph identified by defense counsel as gruesome, during which the State agreed to withdraw several exhibits. The court ruled contemporaneously on the probative value, gruesome nature, and undue prejudice of each individual photograph and ultimately denied Showalter's motion to exclude the identified autopsy photographs, except for those the State had agreed to withdraw.

At trial, Topeka Police Detective Jason Judd, the lead investigator in the case, testified he was present for the victims' autopsies, during which the autopsy photographs were taken. The State then moved to admit into evidence the autopsy photographs contained in Exhibits 103-170, except for those it had agreed to withdraw before trial. Showalter renewed his "previous objections that were ruled on at the pretrial motion" hearing and argued many photographs were repetitive, prejudicial, and irrelevant.

The district court asked whether the parties had reviewed at the pretrial hearing all the photographs the State was seeking to introduce, and defense counsel responded, "All the [photographs] that the State is admitting right now have been reviewed." The court then overruled Showalter's objections and admitted the autopsy photographs at issue into evidence, including Exhibits 126-135. Along with the autopsy photographs, the jury also viewed the video deposition testimony of Dr. Charles Glenn, the forensic pathologist who conducted the victims' autopsies. During his deposition, Dr. Glenn had extensively reviewed the autopsy photographs in Exhibits 126-135. Prior to Dr. Glenn's video deposition being played for the jury, Showalter renewed his objections to all the autopsy photographs.

On appeal, Showalter claims the district court erred by admitting Exhibits 126-135 into evidence because the probative value of the photographs was substantially outweighed by the risk of undue prejudice. Showalter asserts he preserved this claim for

review by lodging contemporaneous objections at trial when the photographs were introduced into evidence through Detective Judd and Dr. Glenn. Although the State does not address preservation in its brief, it merits review here.

b. *Preservation*

The contemporaneous objection rule is set forth in K.S.A. 60-404, which generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Ballou*, 310 Kan. 591, 613-14, 448 P.3d 479 (2019) (discussing K.S.A. 60-404 in detail); see also *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012) (characterizing preservation as a "prudential rather than jurisdictional obstacle to appellate review"). Relevant here, any pretrial objection to the admission or exclusion of evidence must be preserved by contemporaneously objecting at trial, which can be accomplished through a standing objection. See *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014).

The purpose of the rule is self-evident: a timely and specific objection allows the district court to consider as fully as possible—in context—whether the evidence should be admitted, which reduces the chances of using tainted evidence and thus avoids possible reversal and a new trial. *State v. King*, 288 Kan. 333, 341-42, 204 P.3d 585 (2009) (explaining purpose behind contemporaneous-objection rule of K.S.A. 60-404). Kansas appellate courts have sometimes declined to strictly apply the contemporaneous objection rule in certain contexts, but only after finding the underlying purpose for the rule has been satisfied. See, e.g., *State v. Hart*, 297 Kan. 494, 510-11, 301 P.3d 1279 (2013); *State v. Spagnola*, 295 Kan. 1098, 1103, 289 P.3d 68 (2012); *State v. Breedlove*, 295 Kan. 481, 490-91, 286 P.3d 1123 (2012).

Here, Showalter lodged a timely objection to Exhibits 126-135 at trial. But the question is whether his objection at trial was specific enough to allow the district court to consider the claim of error he now presents to us on appeal: that Exhibits 126-135 should not have been admitted into evidence because the probative value of the photographs was substantially outweighed by the risk of undue prejudice. As explained below, the record shows Showalter failed to preserve his evidentiary objections to Exhibits 127-135 but sufficiently preserved his objection to Exhibit 126.

      *i. Exhibits 127-135*

Showalter concedes he did not object to Exhibits 127-135 at the pretrial hearing on his motion to exclude gruesome photographs. This failure deprived the district court of any opportunity to consider at the pretrial hearing whether the probative value of Exhibits 127-135 was substantially outweighed by the risk of undue prejudice.

When Detective Judd testified at trial, the State moved to admit the autopsy photographs in Exhibits 103-170, except for those it had withdrawn. Showalter renewed his objection from his written motion and arguments presented by counsel at the pretrial hearing on his motion to exclude gruesome photographs, after which the following discussion took place:

> "[DEFENSE COUNSEL]: Judge, I would like to renew my previous objections that were ruled on at the pretrial motion. I have made numerous objections to individual photos. I can go through those again. They would be the same as what was ruled on previously by the Court, and I would like to renew those.
>
> "THE COURT: Okay. I just want to make sure I remember which ones. The pretrial you are talking about, is that the one that we had the first time.

11

"[DEFENSE COUNSEL]:  I believe it was November of 2019.

"THE COURT:  Okay. That pretrial. Okay. And then, I'm asking for help on this because I haven't gone through all of that.

"[DEFENSE COUNSEL]:  I can walk through all of them.

"THE COURT:  No, I just need to know, did we go through all the photographs at that time?

"[DEFENSE COUNSEL]:  *All the ones that the State is admitting right now have been reviewed.*

"THE COURT:  Okay. And I ruled on whether they would be admissible or not.

"[DEFENSE COUNSEL]:  *Correct.*

"THE COURT:  I appreciate you telling me that, because I need to know whether I have ruled on these previously, and I'm gonna give any additional objections you have on whether it's—it's a new objection completely, so . . .

"[DEFENSE COUNSEL]:  I do have one additional objection.

"THE COURT:  Okay.

"[DEFENSE COUNSEL]:  At the time, I don't know whether we discussed, kind of, the cumulative affect [*sic*] of so many photographs. There are a lot of repetitive photographs in general. The cause and manner of death in this case are not at issue, and I think that that could have a very prejudicial affect [*sic*], especially given that there are a number of photographs that are taken after procedures have been done to the bodies including where they have shaved their heads, or removed skin, or opened up the skull. I think that can be very prejudicial, and it's not relevant in this case, because there is no issue as to the cause or manner of death.

"THE COURT:  I'm gonna allow you to speak in just a second. If I remember right, we went through each one of those and even the ones on the autopsy where the heads were shaved, because that was the only way we were able to see the knife wounds in some of those head wounds which ones the head was shaved. It's—that's my memory of that. We went through those in that manner. Does the State have anything they want to address on that?

"[PROSECUTOR]:  Just briefly, Judge. We did have a hearing in which all of these photographs were gone through one at a time. The exhibit list that you have notes a certain number of the exhibits that are withdrawn, and that was the result of the hearing where there was consideration for the cumulative nature of some of the pictures. In those instances, the Court either ruled or the State agreed to withdraw those pictures for that purpose. I think all of the arguments that I would make on this point have previously been made at that hearing, and I believe the objection should be overruled.

"THE COURT:  I am going to admit the photograph[s]. I am going to admit those in groups for the record, and they will be from 103 to the first one that was withdrawn, 103 to 114, and I'll note 115 and -16 are withdrawn, and I'll do that for all the way through. And with somebody looking at the record that we are on, doesn't go, 'Where is 115 and 116?' And if I go 103 to 170, it looks like they are all admitted. So just for the record, that's how I'm gonna do it. Thank you for the arguments, though.

"(WHEREUPON, the following proceedings were had in the presence of the jury; to-wit:)

"THE COURT:  The Court is going to admit State's Exhibit Number 103 through 114. I'll note 115 and 116 are withdrawn. The Court will admit 117 through 138. I'll note 139 and 140 were withdrawn. The Court will admit Exhibits 141 through 145. I'll note that 146 and 147 were withdrawn. The Court will admit Exhibits 148 through 154. I'll note 155 was withdrawn. The Court will admit Exhibits 156 through 160. I'll note that 161 was withdrawn. And then Exhibits 162 through 170 will be admitted."

Of course, we now know defense counsel incorrectly represented to the district court that (1) Showalter objected to and (2) the court individually reviewed for admissibility, Exhibits 103-170 at the pretrial hearing, except for those the State had withdrawn. In fact, Showalter never lodged a specific objection to Exhibits 127-135, and the court never reviewed or considered these exhibits. Because the trial transcript shows he objected to Exhibits 103-170 solely by renewing his pretrial objections, Showalter could not have lodged a specific objection to Exhibits 127-135 at trial.

Showalter's failure to specifically object to Exhibits 127-135 at trial deprived the district court of the opportunity to review the exhibits or consider their probative value against risk of undue prejudice—the widely recognized purpose of the contemporaneous objection rule under K.S.A. 60-404. Although acknowledging the court never reviewed Exhibits 127-135, Showalter argues on appeal the court abused its discretion by finding these photographs were not unduly prejudicial and allowing them to be introduced at trial. But Showalter's argument is illogical. He cannot challenge the court's discretion in comparing the probative value of Exhibits 127-135 to their prejudicial effect if he never presented the actual photographs in Exhibits 127-135 to the court for review.

In sum, Showalter failed to preserve his argument that the district court abused its discretion by finding Exhibits 127-135 were not unduly prejudicial and admitting those exhibits into evidence.

### ii. Exhibit 126

Showalter also objected to Exhibit 126 at the pretrial hearing. In this instance, the parties presented extensive argument on its admissibility and, after finding Exhibit 126 was not more prejudicial than probative, the district court overruled Showalter's motion to exclude and held the exhibit was admissible. At trial, Showalter globally objected to Exhibits 103-170 by renewing his pretrial objections, which included Exhibit 126. Thus,

14

Showalter has preserved his argument that the court abused its discretion by finding Exhibit 126 was not more prejudicial than probative.

### c. *Standard of review*

When reviewing a district court's decision to admit photographic evidence, the threshold issue is whether the evidence is relevant. Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). All relevant evidence is admissible unless some other rule provides for its exclusion. See K.S.A. 60-407(f). Notably, we interpret K.S.A. 60-445 as permitting the district court to exclude relevant evidence if its probative value is substantially outweighed by the risk of undue prejudice. *State v. Cross*, 216 Kan. 511, 518, 532 P.2d 1357 (1975). "[T]he decision to admit the photographs over a challenging party's objection that they are overly repetitious, gruesome, or inflammatory, i.e., unduly prejudicial, is reviewed for an abuse of discretion." *State v. Williams*, 308 Kan. 1320, 1333, 429 P.3d 201 (2018). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). As the party asserting error, Showalter bears the burden of proving the district court abused its discretion. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

### d. *Discussion*

Exhibit 126 is a photograph from J.P.'s autopsy showing the top of J.P.'s skull with the skin removed. Showalter concedes Exhibit 126 was relevant but claims the district court abused its discretion by admitting it because its probative value was substantially outweighed by the risk of undue prejudice.

15

At the pretrial hearing, the State argued the photograph was relevant to show premeditation and the violent nature of the crime in a way that the rest of the autopsy pictures did not. Showalter objected to its admission, claiming the photograph of J.P.'s skull after Dr. Glenn removed the skin "is far more gruesome and prejudicial than other photographs. I think the Court has to use extreme caution in introducing any photographs after that type of procedure has been [performed], because that does not reflect the state of the body prior to those intervening medical procedures." The court ultimately determined Exhibit 126 was not more prejudicial than probative, therefore it was admissible:

> "On 126, I do understand [defense counsel's] objection to that. Normally, I do not like to see autopsy photographs. They have to have a very specific purpose in which—why they are being shown. In this case, I believe this photograph meets this.
>
> "It is not a pleasant photograph to look at, but when you look at State's Exhibit 126, that is—that shows three defects to the back crown or skull area of the person in this case with the hair removed. When you look at 126, it reveals the extent of damage that was to the skull. So it—although it is a post autopsy photograph, it shows the amount of force that was used to crack the skull. So I do not find that it is—I find that there's a valid and relevant reason. It's not more prejudicial than probative. I'm gonna admit State's Exhibit 126, also."

Like the trial court, we find Exhibit 126 was not unduly prejudicial. First, the photograph is probative to the manner and cause of death. That Showalter does not challenge cause of death or the number or severity of the wounds is immaterial to whether the evidence is probative of a material fact pursuant to K.S.A. 60-401(b). We have repeatedly held the State must prove cause of death at trial even when the defendant concedes it. *Garcia*, 315 Kan. at 380 (citing *State v. Williams*, 308 Kan. 1320, 1334, 429 P.3d 201 [2018]; *State v. Backus*, 295 Kan. 1003, 1012, 287 P.3d 894 [2012]).

Second, the photograph is uniquely probative to the violent nature of the crime in a way that the rest of the autopsy pictures are not. The State introduced many photographs from the autopsy at trial. The autopsy photographs can be divided into three groups: (1) photographs from Lisa's autopsy showing external injuries, both before and after the body was washed; (2) photographs from J.P.'s autopsy showing external injuries, both before and after the body was washed; and (3) photographs from J.P.'s autopsy, showing internal injuries to the skull, brain, dura, and large neck muscle. Exhibit 126 falls into the third group of autopsy photographs. The extensive internal damage to J.P.'s skull shown in Exhibit 126 directly corresponds to the external injuries to J.P.'s head in Exhibit 125. Thus, one can readily infer from the considerable force used to commit the crime that the perpetrator's conduct was intentional.

Third, the photograph is probative in that it materially assisted the jury's understanding of the pathologist's medical testimony and corroborated the pathologist's testimony and report. See *State v. Robinson*, 293 Kan. 1002, 1028-29, 270 P.3d 1183 (2012); *Williams*, 308 Kan. at 1334. We have long recognized photographs can depict injuries in a way that a coroner's testimony cannot. *Garcia*, 315 Kan. at 380 (citing *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 [2016]).

We agree with Showalter that Exhibit 126 may be gruesome. But, as this court has often said, "'[g]ruesome crimes result in gruesome photographs.'" *Garcia*, 315 Kan. at 380; *State v. Lowry*, 317 Kan. 89, 98, 524 P.3d 416 (2023); *State v. Alfaro-Valleda*, 314 Kan. 526, 536, 502 P.3d 66 (2022); *Williams*, 308 Kan. at 1334 (quoting *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 [2002]). And although we also agree with Showalter that the photograph may be prejudicial to his case, "[a]ll evidence that is derogatory to the defendant is by its nature prejudicial to the defendant's claim of not guilty." *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997). The question is whether the evidence is

17

"unduly prejudicial." *Garcia*, 315 Kan. at 381. "Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, add nothing to the State's case, and bring about a wrong result." *Clark*, 261 Kan. at 478.

We have already determined the photograph may be gruesome. But we also have determined the photograph is not repetitive and had substantial probative value here. In balancing these competing interests, we conclude, as the district court did, that the probative value of Exhibit 126 was not outweighed by the risk of undue prejudice. Thus, the district court did not abuse its discretion in admitting this photograph into evidence.

## 2. *Admitting Dr. Glenn's deposition testimony into evidence at trial*

Showalter challenges the district court's decision to admit Dr. Glenn's deposition testimony into evidence after finding he was unavailable to testify at trial.

### a. *Additional relevant facts*

Before trial, the State moved to depose Dr. Glenn under K.S.A. 22-3211(3), alleging he was an essential witness who may be unable to attend trial and his testimony would be material to establish the cause and manner of Lisa's and J.P.'s deaths. The State explained Dr. Glenn was moving to New Zealand to practice medicine before the scheduled trial and thus would be outside the jurisdiction of the court and the United States when the trial took place. The parties submitted an agreed proposed order authorizing the State to conduct a transcribed and videotaped deposition in Showalter's presence. The district court signed the agreed proposed order granting the motion.

Dr. Glenn's deposition took place on October 29, 2018. Showalter appeared in person and through his counsel. Dr. Glenn testified he would not be employed as the Shawnee County Coroner after November 15, 2018, because he was moving to

Auckland, New Zealand, to work as a forensic pathologist there. He said his last day in the United States would be November 24, 2018. When asked, Dr. Glenn acknowledged he had been personally served with a subpoena to testify in Showalter's upcoming jury trial. The prosecutor then asked Dr. Glenn whether he would be willing to come back to testify at Showalter's trial. Rather than responding to the question in the context of Showalter's trial, Dr. Glenn responded in the context of all outstanding trials for which he had received subpoenas: "It's possible for me to testify in some of these. As far as coming back, I realize it's a possibility . . . however, I think it's impossible for me to come back for all of the jury trials I have subpoenas for, just because I don't think I'll have enough time off . . . and can keep my employment if I was spending weeks at a time away."

On April 1, 2019, the State moved to admit Dr. Glenn's deposition testimony. Because Dr. Glenn had moved to New Zealand, the State expected he would not return to the United States for Showalter's trial. The State noted it had issued a subpoena for Dr. Glenn but suggested he would likely be outside the district court's jurisdiction at the time of the trial. The State acknowledged Dr. Glenn's global statement at the deposition suggesting the possibility of returning to the United States to testify in some cases but also stating it would be impossible to return for all cases due to the distance and lack of time off.

Represented by a new attorney, Showalter objected to the State's motion. He argued in part that the State had not met its burden to establish Dr. Glenn was unavailable under K.S.A. 22-3211(8) and that using the deposition testimony would violate his constitutional right to confront witnesses testifying against him. At a pretrial hearing, Showalter reiterated his objection that the State had failed to establish Dr. Glenn's unavailability and the resulting confrontation violation. The State argued the district court should make the unavailability determination at the time of trial, and the court agreed to reserve its ruling until then.

19

On May 1, 2020, the district court issued a pretrial order addressing various pleadings, including the State's motion to admit Dr. Glenn's deposition testimony. The court noted Showalter's April 28, 2020, jury trial had been continued indefinitely due to the COVID-19 pandemic and had not yet been rescheduled. Even so, the court found Dr. Glenn was unavailable under K.S.A. 22-3211(8)(b) because he lived in New Zealand and the court lacked authority to compel his attendance at Showalter's trial. The court concluded the use of Dr. Glenn's deposition at trial would not violate Showalter's constitutional confrontation rights and granted the State's motion to admit Dr. Glenn's deposition testimony.

Showalter's jury trial finally began on July 12, 2021. After opening statements, the district court held a hearing outside the presence of the jury to address several issues, including Dr. Glenn's unavailability. In relevant part, the State presented testimony from Amber Gonzalez, a legal assistant with the Shawnee County District Attorney's Office. Gonzalez testified she had been in contact with Dr. Glenn for the past couple of years via phone and email to find out whether he could return from New Zealand to testify in various cases. Gonzalez explained she sent separate emails to Dr. Glenn for each case asking if he could return to testify live at trial. In each case, Dr. Glenn always responded he could not do so because he was in New Zealand. Gonzalez testified she did not expect Dr. Glenn's response to be any different when she contacted him to ask about whether he could return to testify live at Showalter's trial. Gonzalez emailed Dr. Glenn the morning before Showalter's jury trial began and asked if he could attend the trial that week. Dr. Glenn responded he could not return due to the travel restrictions in place.

Showalter renewed his objection to the admission of Dr. Glenn's deposition and questioned whether Dr. Glenn was truly unavailable. Showalter argued that asking Dr. Glenn to appear the day before trial was scheduled to begin did not constitute a good-faith effort by the State to secure his attendance. Relying on the evidence just presented

20

as well as its prior order, the district court found Dr. Glenn unavailable under K.S.A. 22-3211(8)(b) and concluded the use of his deposition at trial would not violate Showalter's constitutional confrontation rights. Over Showalter's objection, the district court admitted Dr. Glenn's video deposition into evidence after finding he would remain unavailable throughout the trial. The jury watched the State's direct examination of Dr. Glenn. Showalter asked that the rest of the deposition not be played, so the jury did not view Dr. Glenn's cross-examination, redirect examination, or recross-examination.

b. *Discussion*

Showalter relies on K.S.A. 22-3211(8) and K.S.A. 60-459(g)(4), as well as the Sixth Amendment's Confrontation Clause and section 10 of the Kansas Constitution Bill of Rights, to challenge the district court's decision to admit Dr. Glenn's deposition testimony into evidence.

i. *K.S.A. 22-3211(8) and K.S.A. 60-459(g)(4)*

Showalter argues the district court erred in finding Dr. Glenn unavailable under K.S.A. 22-3211(8), which he claims is a statutory prerequisite to admitting deposition testimony into evidence at trial. Thus, our starting point is K.S.A. 22-3211(8). Relevant here, the statute permits a deposition to be used at trial if it appears:

- the witness is out of the state and his or her appearance cannot be obtained, unless the offering party procured the witness' absence, K.S.A. 22-3211(8)(b); or

- the offering party cannot procure the witness' attendance by subpoena or other process, K.S.A. 22-3211(8)(d).

The district court granted the State's motion to admit Dr. Glenn's deposition testimony into evidence under K.S.A. 22-3211(8) based on findings that Dr. Glenn was out of the state, his appearance at trial could not be obtained, and the State had been unable to procure Dr. Glenn's attendance by subpoena or other process. Showalter does not challenge these findings on appeal. Instead, he claims that under the facts presented here, K.S.A. 22-3211(8) incorporates the witness unavailability requirements of K.S.A. 2022 Supp. 60-460(c)(2) provided in the hearsay exception statute. To establish witness unavailability under the hearsay exception statute, K.S.A. 60-459(g)(4), the prosecution "must show it acted in good faith and made a diligent effort . . . [to] secure the witness' attendance at trial" as articulated in *State v. Keys*, 315 Kan. 690, 709, 510 P.3d 706 (2022). Relying on this rule, Showalter argues the undisputed facts establish the State failed to act in good faith and make a diligent effort to secure Dr. Glenn's *voluntary* attendance at trial, and so Dr. Glenn was not unavailable as a matter of law and his deposition testimony was inadmissible under K.S.A. 22-3211(8).

Showalter's argument fails as it incorrectly assumes the unavailability requirement of K.S.A. 2022 Supp. 60-460(c)(2) governs the admission of Dr. Glenn's depositions here. K.S.A. 2022 Supp. 60-460 requires all hearsay evidence be excluded unless it fits within a specific statutory exception. Subsection (c) creates two categories of hearsay exceptions for depositions and prior testimony. Showalter relies on the second category to argue the judge must find witness unavailability before a deposition can be admitted. The second category is set forth in subsection (c)(2), which provides a hearsay exception if the judge finds, among other things,

- *that the declarant is unavailable* and
- the witness testimony was given
  - *in another action*, or

- in a preliminary hearing or former trial *in the same action*, or
- in a deposition for use as testimony *in the trial of another action*.
  K.S.A. 2022 Supp. 60-460(c)(2).

Although Showalter is correct that K.S.A. 2022 Supp. 60-460(c)(2) requires the judge to make a finding of unavailability, this subsection of the statute does not apply here because Dr. Glenn's deposition testimony was not given *in another action*, or in a preliminary hearing or former trial *in the same action*, or in a deposition for use as testimony *in the trial of another action*. Instead, Dr. Glenn's deposition testimony was admissible under the first category of hearsay exceptions for depositions and prior testimony set forth in subsection (c)(1), which provides a hearsay exception for deposition testimony

"taken in compliance with the law of this state *for use as testimony in the trial of the action in which offered*." (Emphasis added.) K.S.A. 2022 Supp. 60-460(c)(1).

Here, the State sought to depose Dr. Glenn before trial to establish the cause and manner of Lisa's and J.P.'s deaths because Dr. Glenn was moving to New Zealand before the scheduled trial and would be outside the court's jurisdiction when the trial took place. Thus, his deposition testimony falls squarely under the hearsay exception in K.S.A. 2022 Supp. 60-460(c)(1). The purpose of taking a deposition under K.S.A. 22-3211 is to perpetuate testimony. *State v. Hernandez*, 227 Kan. 322, 327-28, 607 P.2d 452 (1980). K.S.A. 22-3211(8)(b) allows the use of a deposition at trial if it appears the witness is out of the state, the witness' appearance at trial could not be obtained, and the State had been unable to procure the witness' attendance by subpoena or other process. This requirement does not place upon the State the increased burden of showing unavailability as does K.S.A. 2022 Supp. 60-460(c)(2). The district court did not err by admitting Dr. Glenn's deposition testimony into evidence at trial under K.S.A. 22-3211(8).

### ii. Confrontation Clause

Showalter argues the district court's decision to admit Dr. Glenn's deposition testimony into evidence upon a finding he was unavailable to testify at trial violated his right to confront witnesses guaranteed in the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. The Sixth Amendment's Confrontation Clause provides an accused "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; see also *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (holding Sixth Amendment's Confrontation Clause binds States through the Fourteenth Amendment). Section 10 of the Kansas Constitution Bill of Rights guarantees "[i]n all prosecutions, the accused shall be allowed . . . to meet the witness face to face." Kan. Const. Bill of Rights, § 10. Showalter does not suggest that our state Constitution grants greater protection to the accused than does the Sixth Amendment's Confrontation Clause, so we apply the Sixth Amendment Confrontation Clause standard to his section 10 confrontation claim. Our decision to apply the Sixth Amendment standard is based on the arguments presented in this case and should not be read to preclude a potential future argument claiming section 10 grants greater protection to the accused than the Sixth Amendment.

"Issues related to confrontation under the Sixth Amendment to the United States Constitution or the Kansas Constitution Bill of Rights, § 10 raise questions of law over which this court exercises de novo review." *Brown*, 285 Kan. at 282. In *Crawford v. Washington*, the United States Supreme Court held hearsay testimonial evidence in criminal prosecutions is admissible under the Confrontation Clause of the Sixth Amendment only when (1) the witness is unavailable and (2) the accused had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The State correctly points out that Showalter's arguments focus entirely on the district court's unavailability determination and the State's efforts to establish Dr. Glenn's unavailability. Showalter does not challenge the adequacy of his ability to cross-examine Dr. Glenn during the deposition, likely because Showalter appeared in person and through his counsel at the deposition. Given he does not challenge it, we will not address that issue. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.).

A witness is "unavailable" for Confrontation Clause purposes only if "prosecutorial authorities have made a good-faith effort to obtain [the witness'] presence at trial." *Hardy v. Cross*, 565 U.S. 65, 69, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011) (quoting *Barber v. Page*, 390 U.S. 719, 724-25, 88 S. Ct. 1318, 20 L. Ed. 2d 255 [1968]). That said, constitutional provisions "[do] not require the doing of a futile act," and "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *abrogated on other grounds by Crawford*, 541 U.S. at 60.

Showalter argues the district court erred in finding Dr. Glenn unavailable for Confrontation Clause purposes, and thus erred in admitting Dr. Glenn's deposition testimony, because the State failed to make a good-faith effort to secure Dr. Glenn's live presence at trial. In support, Showalter claims "Dr. Glenn expressed a willingness to return and testify in this case" but the State did not ask him if he would be willing to do so until the night before Showalter's trial began.

Contrary to Showalter's assertion, Dr. Glenn never expressed a willingness to return and testify live *in this case*. Dr. Glenn generally commented that coming back to testify in some cases was possible but he would be unable to keep his new job in New Zealand if he was spending weeks at a time away. After Dr. Glenn moved to New Zealand, the State maintained contact with him. The district court rescheduled

Showalter's jury trial multiple times and continued it indefinitely on March 20, 2020, because of the COVID-19 pandemic. The State issued subpoenas via email to Dr. Glenn on March 18, 2019; April 30, 2019; August 2, 2019; and March 10, 2020. Showalter's trial was eventually scheduled for July 12, 2021. Gonzalez testified that whenever she emailed Dr. Glenn about returning for other jury trials, his response was always the same: he could not come to the United States to testify because he was in New Zealand. Gonzalez did not expect Dr. Glenn's answer to be any different when she emailed him the day before Showalter's trial was scheduled to begin. Indeed, Dr. Glenn responded he could not return for the trial due to travel restrictions. It is unclear from the record whether international travel restrictions due to the COVID-19 pandemic permitted travel from New Zealand to the United States at that time, but the State suggested a New Zealand resident would have been required to quarantine for three weeks following international travel.

Although the State might have contacted Dr. Glenn earlier than the day before trial was scheduled to begin, reasonable and good-faith efforts here did not require the State to do so. See *Roberts*, 448 U.S. at 74 (measure of State's effort is one of reasonable diligence and the law does not require the doing of a futile act). In the almost three-year period between when Dr. Glenn moved to New Zealand in 2018 and Showalter's trial in 2021, Dr. Glenn never traveled from New Zealand to testify live at a jury trial. And it is questionable whether such travel would have been feasible or even permitted given the travel restrictions in place during the COVID-19 pandemic. Under these circumstances, we find the State made sufficient and reasonable efforts to establish Dr. Glenn's unavailability for purposes of the Confrontation Clause. Thus, the district court did not err in admitting Dr. Glenn's deposition testimony as evidence in trial.

In affirming the district court's decision to admit Dr. Glenn's deposition testimony into evidence, we also recognize the United States Supreme Court's relevant holding in *Mancusi v. Stubbs*, 408 U.S. 204, 92 S. Ct. 2308, 33 L. Ed. 2d 293 (1972), which Showalter failed to reference in his brief.

In *Mancusi*, the United States Supreme Court held that a witness residing in a foreign country is necessarily unavailable for purposes of the Confrontation Clause. 408 U.S. at 212-13. *Mancusi*'s holding does not require the prosecution to ask a witness in a foreign country to voluntarily return to satisfy the State's burden of unavailability though some courts have held reasonable and good-faith efforts impose such a requirement. See, e.g., *Commonwealth v. Hunt*, 38 Mass. App. Ct. 291, 295, 647 N.E.2d 433 (1995) (relying on *Mancusi* for the proposition that witness unavailability is conceded "[w]hen a witness is outside of the borders of the United States *and declines to honor a request to appear as a witness* . . . because a [s]tate of the United States has no authority to compel a resident of a foreign country to attend a trial here"); cf. *Hamilton v. Morgan*, 474 F.3d 854, 859 (6th Cir. 2007) ("If the desired witness is beyond the subpoena power of the trial state but an established procedure of voluntary cooperation exists, then the government must go to reasonable lengths to utilize that procedure to locate, contact, and arrange to reasonably transport the witness."); *United States v. Siddiqui*, 235 F.3d 1318, 1323-24 (11th Cir. 2000) (concluding that two witnesses were unavailable and admitting their prior Rule 15 depositions where the witnesses testified, respectively, that it would be "impossible for [the first witness] to travel to the United States for the trial" and that "'[the second witness] d[id not] want to go, if possible'"); *United States v. Sanford, Ltd.*, 860 F. Supp. 2d 1, 4 (D.D.C. 2012) ("A witness who resides abroad and outside the reach of a court's subpoena power is not automatically 'unavailable' without a further showing that he or she will not testify in court.") (quoting *United States v. Warren*, 713 F. Supp. 2d 1, 4 [D.D.C. 2010]); *State v. Hassapelis*, 620 A.2d 288, 289, 292-93 (Me. 1993)

(finding efforts insufficient to establish unavailability where the State did not ask a Canadian witness if he was available to attend trial, did not serve him with a subpoena, and presented no evidence showing the witness was unavailable).

Although appearing to concede Dr. Glenn is a witness residing in a foreign country outside of any reasonable legal means to compel attendance, Showalter argued the State failed to make a good-faith effort to secure Dr. Glenn's *voluntary* attendance at trial, as described above. But Showalter's argument ignores *Mancusi's* holding that a witness residing in a foreign country is necessarily unavailable. See 408 U.S. at 212. Although other jurisdictions have construed *Mancusi* broadly to require the prosecution ask a witness in a foreign country to voluntarily return to satisfy its burden of unavailability, Showalter has not asked us to do so here.

3. *Admitting co-conspirator statements into evidence at trial*

Showalter argues the district court erred in allowing the State to introduce evidence that Sportsman claimed membership in the MS-13 gang and that his superior, Penny, had ordered him to kill Lisa. Showalter claims this evidence was irrelevant to the question of his motive because the State failed to prove Showalter heard or was aware of Sportsman's claims.

a. *Additional relevant facts*

Before trial, the State moved to admit certain evidence under K.S.A. 2022 Supp. 60-460, including statements made by Sportsman regarding his membership in the MS-13 gang and Penny's orders to kill Lisa. The State argued Sportsman's statements did not constitute hearsay because it was not seeking to admit the statements for the truth of the matter asserted. Instead, the State claimed the statements were relevant to explain the context of the agreement to kill Lisa and to show Showalter's motive and intent in

28

committing the murders for Sportsman. Alternatively, the State alleged the statements were admissible under several hearsay exceptions. In response, Showalter argued the court should admit only statements made to him or in his presence.

After reviewing the parties' arguments, the district court held Sportsman's statements about MS-13 and Penny were not hearsay because they were not offered to prove the truth of the matter asserted. Pending foundation requirements, the court held these statements admissible because they were relevant to explain why Sportsman had asked Showalter and the other men to kill Lisa and to provide a motive for Showalter's participation in the murders.

At trial, the State presented testimony from several witnesses regarding Sportsman's claimed membership in MS-13 and his statements about Penny. When the State attempted to elicit this testimony from two of these witnesses, Charles Vinsonhaler and Larissa Mills, Showalter raised hearsay objections. The district court overruled the objections after the State advised this evidence was subject to the court's pretrial ruling. Vinsonhaler and Mills both testified they heard Sportsman say he was a member of MS-13. Mills also testified Sportsman talked about "the head lady named Penny" and showed her a photograph of Penny. Mills said she then believed the woman in the photograph was Penny but now knew it was a photograph of United States Representative Nancy Pelosi with tattoos covering her face. Finally, Mills said she never heard Showalter say that he did not believe Sportsman was a member of MS-13 or that he doubted whether Sportsman's claims about MS-13 were true.

Diederich also testified about the MS-13 evidence, but Showalter did not object to this testimony. Diederich said Sportsman told her he was a branch leader of the Mexican gang MS-13 and the gang's leader, Penny, lived in Topeka. According to Diederich, Sportsman said Penny would call him with instructions or missions to complete. Diederich heard Sportsman talk about MS-13 more than once but never witnessed him

talking about it in front of Showalter. Diederich testified that the week before Sportsman was arrested in Topeka, Sportsman told her "Penny called and told him that either him or Lisa was gonna have to die, and it was up to him." After that, Diederich said Sportsman asked to talk to Showalter, and she saw the two men talking outside. Diederich then heard Showalter say, "'I don't have a problem killing the bitch.'"

Showalter challenges the testimony outlined above from Vinsonhaler, Mills, and Diederich. He argues the testimony is irrelevant because the State did not prove he was aware of Sportsman's claims. The State responds Showalter did not preserve this issue for appeal, and he is otherwise not entitled to relief on the merits.

   b. *Preservation*

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *Ballou*, 310 Kan. at 613-14. In his brief, Showalter suggests he preserved his challenge to the MS-13 testimony from Vinsonhaler and Mills by renewing his pretrial objection that Sportsman's claims were irrelevant if not made in Showalter's presence. True, Showalter did argue *before trial* that the district court should only admit statements made in his presence. But when the State sought to admit Sportsman's statements about MS-13 through Vinsonhaler and Mills *at trial*, Showalter only objected based on hearsay. Because a pretrial ruling "'is subject to change when the case unfolds,' . . . a pretrial objection must be contemporaneously renewed during trial." *Richard*, 300 Kan. at 721 (quoting *Luce v. United States*, 469 U.S. 38, 41, 105 S. Ct. 460, 83 L. Ed. 2d 443 [1984]; *State v. Inkelaar*, 293 Kan. 414, 421, 264 P.3d 81 [2011]). Moreover, a party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *State v. Robinson*, 306 Kan. 1012, 1028-29, 399 P.3d 194 (2017).

Showalter failed to preserve his challenge to the relevancy of the MS-13 testimony from Vinsonhaler and Mills.

As for Diederich's testimony about MS-13, Showalter acknowledges his failure to object to this testimony at trial. But he asks this court to consider the merits of his argument anyway, relying on *State v. Race*, 293 Kan. 69, 259 P.3d 707 (2011). In *Race*, the defendant did not object to a witness' trial testimony about a child victim's accusations against him but argued on appeal that this testimony constituted inadmissible hearsay. Despite the defendant's failure to object below, this court made a substantive exception to the contemporaneous objection rule because the defendant had made an unsuccessful hearsay objection to earlier testimony from another witness regarding the child victim's allegations. 293 Kan. at 75.

Showalter urges us to apply this same logic to his challenge to Diederich's testimony. He claims that because he had unsuccessfully renewed his pretrial relevance objections during earlier testimony from Vinsonhaler and Mills, the district court was unlikely to issue a different ruling with respect to Diederich's testimony. Showalter also notes that he lodged a failed hearsay objection to the question posed just before the prosecutor asked Diederich if she had ever heard Sportsman talk about MS-13.

Showalter's reliance on *Race* is misplaced. *Race* involved a situation where we allowed the defendant to raise an unpreserved *hearsay* objection on appeal after he had unsuccessfully raised a *hearsay* objection to earlier testimony from another witness on the same topic. Here, Showalter raises an unpreserved *relevance* objection after unsuccessfully lodging *hearsay* objections to the MS-13 testimony from Vinsonhaler and Mills and to previous testimony from Diederich on an unrelated topic. Thus, *Race* does not apply to save his argument. As a result, we find that Showalter did not preserve his challenge to Diederich's testimony. See *Dupree*, 304 Kan. at 62; *Gaona*, 293 Kan. at 956.

31

4. *Cumulative error*

Finally, Showalter argues the cumulative effect of the alleged errors warrants reversal of his convictions. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establishes the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). But when an appellate court finds no errors exist, the cumulative error doctrine cannot apply. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). Because Showalter establishes no errors, his cumulative error argument necessarily fails.

Affirmed.